UNITED STATES of America, Appellee,

v.

Jose Antonio GIRALDO,
Defendant-Appellant.

No. 951, Docket 86–1487.

United States Court of Appeals,
Second Circuit.

Argued March 27, 1987.

Decided June 4, 1987.

Alfred U. Pavlis, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., S.D.N.Y., Aaron R. Marcu, Asst. U.S. Atty., New York City, on the brief), for appellee.

Russell J. Carbone, Kew Gardens, N.Y. (Emanuel A. Moore, Mario Malerba, Kew Gardens, N.Y., on the brief), for defendant-appellant.

Before TIMBERS, KEARSE and PIERCE, Circuit Judges.

KEARSE, Circuit Judge:

Defendant Jose Antonio Giraldo appeals from a judgment of the United States District Court for the Southern District of New York, entered after a jury trial before Kevin Thomas Duffy, Judge, convicting him of conspiring to distribute cocaine and to possess cocaine with intent to distribute it, in violation of 21 U.S.C. § 846 (1982), and of attempting to distribute cocaine, in violation of 21 U.S.C. §§ 812, 841(a)(1), and 846 (1982), of 21 U.S.C. § 841(b)(1)(A)

(1982), as amended, Oct. 12, 1984, Pub.L. 98–473, tit. II, § 502, 98 Stat. 2068, and of 18 U.S.C. § 2 (1982). Giraldo was sentenced to concurrent terms of imprisonment of 40 years on each count, without parole, and assessed a special $50 fine on each count. On appeal, he contends principally that he was denied a fair trial by the district court's mid-trial sentencing of an alleged coconspirator, causing the latter to testify against him, and that the trial court erred in admitting certain tape recordings into evidence against him. Finding no merit in any of his contentions, we affirm the judgment of conviction.

## I. BACKGROUND

The government's proof at trial was presented principally through (1) the testimony of law enforcement officers, (2) the testimony of Albertose Mesa, who had originally been a codefendant of Giraldo and had pleaded guilty to two counts of a superseding information, and (3) the introduction of physical evidence seized from Giraldo's apartment, including cocaine, cash, documents, and answering machine tape recordings that the government contended reflected coded orders for cocaine. Taken in the light most favorable to the government, the evidence was as follows.

### A. The Events Leading to Giraldo's Arrest

In May 1984, undercover New York City Police Detective Robert Johnson was introduced to Albertose Mesa, who undertook to find a source that could supply Johnson with 10–20 kilograms of cocaine per week. In the months that followed, Mesa attempted, through his brother, to find a cocaine source in Colombia. On the evening of December 13, 1984, Mesa's brother received a call from a male voice that stated, "We got the stuff in New York." Mesa spoke to the caller, who identified himself as "Tony" or "Tono". A series of telephone calls followed between Mesa and Tony and between Mesa and Johnson to arrange for the delivery to Johnson of five kilograms of cocaine on December 17, with

additional sales of 10–20 kilos to follow if all went well.

On December 17, Johnson and Mesa agreed to meet at a restaurant at 8 p.m. Johnson asked Mesa to call his beeper once Mesa had the cocaine in his possession. At about 7 p.m., Johnson's beeper sounded and displayed the telephone number 507–0974. Johnson called the number and asked if Mesa was there. A male voice replied, "No. He go there. Don't worry."

At 8 p.m., Johnson was met at the restaurant by Mesa, accompanied by Roberto Ramos, a codefendant at the trial below who was acquitted of the charges against him. Mesa said the cocaine was in their car; Ramos then went to that car, and Mesa and Johnson went to Johnson's car where Johnson showed Mesa a "flash roll" of $80,000 in cash. Mesa then left to retrieve the cocaine and returned a short time later in a car driven by Ramos. Ramos told Johnson the cocaine was in the trunk and released the trunk latch from inside the car. After Mesa opened the trunk and showed Johnson a flight bag containing the five kilos of cocaine, Ramos and Mesa were arrested.

Following these arrests, Ramos told the arresting agents that, before going to the restaurant, he had driven Mesa to 80–22 47th Avenue in Queens. Mesa had entered the second-floor apartment at that address with an empty flight bag and minutes later had come out carrying a full flight bag that he placed in the trunk of Ramos's car.

During their early communications, Tony had told Mesa that his address was 80–22 47th Avenue in Queens. A check with the telephone company revealed that 507–0974, the number that had appeared on Johnson's beeper, was subscribed to at that address. The second-floor apartment at that address had been rented to Giraldo under an alias and was occupied by Giraldo, his wife, and his two female children.

Late on the evening of the arrests, agents executed a search warrant for the second-floor apartment at 80–22 47th Avenue. Shortly after the search began, Giraldo arrived. Urged by the agents to cooperate, Giraldo led them to an open safe in

which the agents found, *inter alia*, 1.7 kilograms of cocaine and more than $72,000 in cash, and to a closet in which they found triple-beam scales and other paraphernalia commonly used in narcotics operations. The agents also found coded drug records and a telephone answering machine containing a tape that had recorded several messages. The messages were terse orders in terms of bread and chicken. One man called twice to order single piece of pita bread for delivery; another stated, "I need the bread very badly"; a third started to say that he needed some bread but, perhaps realizing that the message was being recorded, stopped in mid-sentence, said "Oh my goodness," and hung up. The government argued that these messages were coded orders for cocaine.

### B. *Mesa's Testimony*

In February 1985, Mesa pleaded guilty to two counts of a three-count superseding information and entered into a cooperation agreement with the government. In his allocution, he made statements inculpating both Giraldo and Ramos. In September 1986, however, immediately before the trial of Giraldo and Ramos was to begin, Mesa recanted his statements about Ramos's involvement in the cocaine conspiracy. The government revoked Mesa's cooperation agreement and announced that it would call him as a hostile witness.

When called as a witness at the trial, Mesa, outside the presence of the jury, announced his intention to invoke his Fifth Amendment privilege against self-incrimination. The trial court then granted him use immunity pursuant to 18 U.S.C. §§ 6001–6003 (1982) and ordered him to testify. The jury was returned to the courtroom and Mesa began to testify. When questioned about having received a call from Tony on December 13, 1984, however, Mesa refused to answer. The jury was sent out of the courtroom, and the court warned Mesa that if he persisted in refusing to testify, he would be held in contempt of court and would be sentenced that day on the counts to which he had pleaded guilty.

Following a lunch recess, Mesa persisted in his refusal, and Judge Duffy promptly found him in contempt of court. Mesa waived his right to a presentence report on his outstanding narcotics charges, and Judge Duffy thereupon sentenced him to, *inter alia*, six months' imprisonment for contempt, to follow a total of 40 years' imprisonment on the two counts to which he had pleaded guilty, with recommendations that Mesa serve his prison term in Marion, Illinois, and not be considered for parole.

The next day, Mesa decided to testify. When the government recalled him to the witness stand, he testified that "Tony" was Giraldo, and that Mesa had received from Giraldo at 80–22 47th Avenue the five kilograms of cocaine he tried to sell to Johnson. Mesa also testified that he had been sentenced to 40½ years of imprisonment by Judge Duffy after refusing to testify the day before, that he no longer had any agreement with the government, and that he was hoping his cooperation would lead the court to reduce his sentence.

The jury convicted Giraldo on both of the counts against him. A few months later, the court vacated Mesa's sentence for contempt, reduced his prison term from 40 years to four years, and withdrew the recommendations that he serve his prison term in Illinois and be ineligible for parole.

## II. DISCUSSION

Giraldo has appealed his conviction, contending principally that he was denied a fair trial because the court improperly abandoned its impartial role by, *inter alia*, threatening Mesa with punishment for refusing to testify and then by imposing on Mesa a lengthy prison term, thereby coercing him to give inculpatory testimony against Giraldo. In addition, Giraldo challenges the sufficiency of the evidence to convict him of conspiracy, contends that the court should not have allowed in evidence the taped answering machine messages, and argues that even if the tapes were properly admitted in evidence, the government's summation use of them was improper. We reject all of these conten-

tions and affirm the judgment of conviction.

## A. *Mesa's Testimony*

Giraldo contends that he is entitled to a new trial principally on the grounds that the court (1) abandoned its impartial role by counseling the government not to recall Mesa to testify after his initial refusal, and (2) improperly coerced Mesa to testify against Giraldo. Although we have some concern for the district court's actions from the perspective of Mesa, we cannot conclude that Giraldo was denied a fair trial.

### 1. *The Alleged Bias*

■ A defendant has, of course, a due process right to a trial before a judge who has no actual or apparent bias. *See generally Daye v. Attorney General*, 696 F.2d 186, 196–97 (2d Cir.1982) (en banc), *cert. denied*, 464 U.S. 1048, 104 S.Ct. 723, 79 L.Ed.2d 184 (1984). Where there is no showing of actual bias, the validity of the bias contention turns on whether the judge's actions could reasonably be viewed as having given the jury the impression that he was partial to the prosecution. *See, e.g., United States v. Pisani*, 773 F.2d 397, 402 (2d Cir.1985). Giraldo has failed to show any real or apparent bias.

■ Giraldo's principal complaint of bias is that the court tried to dissuade the government from recalling Mesa to the witness stand after the court had sentenced him, and thus appeared to be counseling the government as to how best to present its case. In addition, Giraldo contends that the court unfairly assisted the government by threatening to hold Mesa in contempt if he did not testify and by imposing a harsh sentence that forced Mesa to testify. Given the fact that defendants objected to the government's recalling Mesa, we think it ill behooves Giraldo to characterize as bias the court's attempt to dissuade the government to forgo the Mesa testimony. In any event, the record reveals no actual bias on the part of the court, either in its actions toward Mesa or in urging the government not to recall Mesa after sanctions and sentence had been imposed.

Nor does the record support any contention that the trial was infected by an apparent bias that could have had an impact on the jury's view of the case, for all of the actions complained of took place outside the presence of the jury. Though it is true that the jury was informed, through the questioning of Mesa when he was recalled, that the court had imposed on him long sentences on the offenses to which he had pleaded guilty, this was information the jury was entitled to have in order to assess Mesa's credibility. It was not the type of information that gave any appearance of judicial bias and it is not a basis for reversal.

### 2. *The Coercion of Mesa*

■ The remainder of Giraldo's challenge to the Mesa testimony appears to be twofold. First, he contends that it is improper for a court to use any coercion whatever to induce a recalcitrant witness to testify against a defendant in a criminal trial. Second, he contends that, even if some coercion is permissible, Judge Duffy's coercive measures exceeded the bounds of propriety. The first contention borders on the frivolous. The court and the jury are entitled to know the relevant evidence possessed by any witness, so long as that person is not privileged to withhold it. The only privilege invoked by Mesa was that against self-incrimination under the Fifth Amendment. Having foreclosed the invocation of that privilege by granting Mesa use immunity for his testimony, *see, e.g., Kastigar v. United States*, 406 U.S. 441, 448–59, 92 S.Ct. 1653, 1658–64, 32 L.Ed.2d 212 (1972), the court was empowered to order him to testify. Mesa's disobedience of this lawful order constituted a contempt of court for which he could lawfully be subjected to civil sanctions, including imprisonment, designed to compel him to obey the court's order. *See, e.g., Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed.2d 622 (1966); *United States v. Hughey*, 571 F.2d 111, 114–15 (2d Cir.1978).

We have somewhat greater difficulty, however, with Giraldo's contention that

Judge Duffy's coercive measures went too far, and we would be quite concerned if this argument were before us on an appeal by Mesa himself from the sentence originally imposed on him. Several sets of principles inform our concern. First, the authority of the court to impose civil contempt sanctions is limited by the concept that such sanctions are by their nature coercive rather than punitive. *See, e.g., Simkin v. United States,* 715 F.2d 34, 36 (2d Cir.1983). This principle is reflected in both standard and ad hoc temporal limitations imposed on the use of the sanction. Thus, the duration of a witness's civil confinement for refusing to testify in court is not permitted to exceed the life of the court proceeding or 18 months, whichever is shorter. 28 U.S.C. § 1826(a) (1982). And if, during this maximum period, it becomes clear that there is no realistic possibility that the sanction imposed for civil contempt will have the desired coercive effect, the sanction should be ended. *See, e.g., Simkin v. United States,* 715 F.2d at 37.

Second, the sentencing court has wide discretion in imposing sentence, and, under the law applicable to Mesa's sentencing, if a sentence is within the permissible statutory limits and it does not appear that the court took into account any improper factor, the sentence may not be reviewed on appeal. *Gore v. United States,* 357 U.S. 386, 393, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958); *United States v. Mejias,* 552 F.2d 435, 447 (2d Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 154, 54 L.Ed.2d 115 (1977); *United States v. Hendrix,* 505 F.2d 1233, 1235 (2d Cir.1974), *cert. denied,* 423 U.S. 897, 96 S.Ct. 199, 46 L.Ed.2d 130 (1975). The proper purposes of the sentencing of criminal offenders are generally thought to encompass punishment, prevention, restraint, rehabilitation, deterrence, education, and retribution. *See* W. LaFave & A. Scott, *Handbook on Criminal Law* 21–25 (1972). A sentence imposed for an improper purpose is subject to vacation on appeal. *See, e.g., United States v. Wardlaw,* 576 F.2d 932, 937–39 (1st Cir.1978); *United States v. Hartford,* 489 F.2d 652, 654 (5th Cir.1974); *United States v. Brown,* 479 F.2d 1170, 1174 (2d Cir.1973).

Third, it is not improper for the sentencing court to take into account a defendant's refusal to cooperate with the government and to impose on him a harsher sentence than would have been imposed had he cooperated. *See Roberts v. United States,* 445 U.S. 552, 557–58, 100 S.Ct. 1358, 1362–63, 63 L.Ed.2d 622 (1980).

Viewed in isolation, each facet of the district court's treatment of Mesa appears consistent with one or another of these principles. The court stated that six months' confinement was imposed for civil contempt, a period within the limits allowed by § 1826(a). Its two consecutive 20–year sentences on the criminal charges did not exceed the maxima allowed by the statutes under which Mesa had pleaded guilty. The court took into consideration Mesa's refusal to cooperate, as it was entitled to do under *Roberts v. United States.*

Yet given closer scrutiny and viewed as a whole, the court's treatment of Mesa suggests a circumvention of the most pertinent principles. First, the designation of the six-month period as confinement for civil contempt has an earmark of mere window-dressing since those six months were to follow, not precede, Mesa's 40–year imprisonment on the criminal charges. Presumably the court did not believe the Giraldo trial would still be going on 40 years hence, and thus there was no prospect that the civil sanction could have any coercive effect.

On the other hand, it strongly appears that the imposition of the 40–year prison term was designed, in large part, not for the customary purposes of criminal sentencing but rather for the purpose of coercing Mesa to testify. Had the court wished to sentence Mesa to 40 years merely as punishment for his crimes and his refusal to cooperate or to achieve any other traditional sentencing goal, it could have sentenced him after the Giraldo trial had ended as easily as during the trial. The actual timing of the sentencing, coming as it did in the middle of the Giraldo trial and without the customary delay for receipt of a presentence report, suggests that the court

intended Mesa's sentence on the criminal offenses to have an impact on that trial.

This suggestion, implicit in the timing, is confirmed by the court's statements both before and after sentencing. Thus, in threatening Mesa with a long penal sentence, the court told him that he faced the possibility of going to jail for 40 years on the charges to which he had pleaded guilty, that the court would "give it to [him]," and that, as Mesa was then 34 years old, his "chances of getting out of prison would be some time after most people retire. So you better think about whether you want to maintain your silence. In case you have any doubt about it, I'll sentence you today." (Trial Transcript, October 7, 1986 ("Tr."), at 468–69.) The court did indeed sentence Mesa that day to more than 40 years in prison, without parole, to be served in Marion, Illinois, some 1,000 miles from his home. To add to the immediate impact of this, the court ordered the marshal to "[m]ake sure he gets shipped out to Marion this week." (Tr. 476.)

Later that day, Mesa offered to testify in exchange for having the sentence vacated. The court indicated that the only way Mesa might achieve a reduction of his sentence was to make a motion pursuant to Fed.R. Crim.P. 35 after the close of the pending trial (Tr. 482–83), and to show "some change of the situation." (Tr. 493.)

■ Finally, though in colloquy the next day the court urged the government not to recall Mesa, the strong initial impression that the court intended its 40–year sentence to be coercive is reinforced by the overall sequence of the court's actions: The court sentenced Mesa immediately after his refusal to testify, seeking and obtaining a waiver of a presentence report; it sentenced him to 40 years in a prison 1,000 miles from his home and recommended that he be ineligible for parole; and it ordered him shipped out to his new prison that very week; but soon after Mesa testified, the court reduced the 40–year sentence to four years, and withdrew the recommendations of distance and parole ineligibility. In all the circumstances, this Court is left with the firm impression that the district court

improperly used its original 40–year sentence principally to coerce Mesa to testify, thereby subverting both the proper purposes of sentencing for criminal offenses and the temporal limitations on civil contempt sanctions.

■ Nonetheless, while these considerations would have carried considerable weight in an appeal by Mesa from the sentences originally imposed on him, they do not necessarily mean that Giraldo is entitled to relief from his conviction. All of the above restrictions on the powers of the sentencing court are intended as safeguards for the benefit of the person sentenced, not for a defendant against whom the sentenced person may testify, and unless we see some prejudice to the defendant, there is no basis on which to set aside the defendant's conviction. Here, though Giraldo plainly was disadvantaged by having Mesa testify against him, he obviously had no privilege to have Mesa's testimony withheld, and under the circumstances of this case, Giraldo has suffered no prejudice in the eyes of the law. Mesa's testimony against Giraldo at the trial was consistent with the statements he had made at his plea allocution, which inculpated Giraldo. Mesa's recantation of some of his plea allocution statements prior to Giraldo's trial was unrelated to Giraldo; in that recantation Mesa had sought to exonerate only Ramos—an exoneration Mesa adhered to at trial. Thus, it does not appear that the coercion in any way caused Mesa to express a view of Giraldo's role that he had ever contradicted. Finally, the jury was amply informed of the facts that Mesa had once had a cooperation agreement with the government but no longer had such an agreement, that the court had sentenced him to 40½ years in jail, and that he was testifying with the hope that the court would reduce that sentence.

In sum, though we disapprove of the district court's initial sentencing of Mesa, we cannot conclude, in light of the facts that Mesa had already inculpated Giraldo, had never recanted that inculpation, and testified consistently with it, and that the jury was appropriately informed of the

facts surrounding Mesa's decision to testify, that Giraldo was prejudiced by the district court's treatment of Mesa or that Giraldo's conviction should be set aside.

### B. *The Tape*

Giraldo makes several attacks on the government's use at trial of the answering machine tape recordings seized from his apartment. They include the contentions that (1) the tape should have been excluded pursuant to Fed.R.Crim.P. 16 because the government had not given defense counsel copies of the tape as requested prior to trial; (2) the tape should have been excluded pursuant to Fed.R.Evid. 404(b) as inadmissible evidence of other crimes or pursuant to Fed.R.Evid. 802 as hearsay; and (3) in its summation, the government could not properly suggest that the tape's contents were orders for narcotics because it had presented no expert testimony to support such an interpretation. We reject each of these contentions.

### 1. *Disclosure*

■ Rule 16(a)(1)(C) requires the government, upon request, to disclose to the defendant documents and tangible objects that the government intends to use as evidence in chief at the trial. Rule 16(d)(2) provides that if a defendant calls to the court's attention that such a discovery request has not been complied with, the court

> may order [the government] to permit the discovery or inspection, grant a continuance, or prohibit the [government] from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances.

Thus, under this Rule, the court may allow previously undisclosed tapes to be introduced after a delay of a few days to permit counsel in the interim to inspect them and fashion a challenge to them. *See, e.g., United States v. Knohl*, 379 F.2d 427, 442 (2d Cir.), *cert. denied*, 389 U.S. 973, 88 S.Ct. 472, 19 L.Ed.2d 465 (1967). Given the permissive language of Rule 16(d)(2) and the wide latitude given the trial court by that Rule, an order under Rule 16(d)(2) will not be set aside except for abuse of discre-

tion. *See United States v. Hartley*, 678 F.2d 961, 977 (11th Cir.1982), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983); Fed.R.Crim.P. 16 Advisory Committee Note.

Though it is unclear from the record whether or not the answering machine tape had been given to defense counsel before the trial began, we see no abuse of the trial court's discretion in receiving the tape in evidence. When counsel advised the court at trial that they had not received the tape, the court did not pursue further the government's representation that disclosure had in fact been made previously, but ordered the government immediately to play the tape for counsel outside the presence of the jury. Pursuant to this order the contents of the tape were disclosed to counsel on September 30, 1986; the tape then was not offered into evidence until October 8. Defense counsel did not seek a continuance or any further delay of the introduction of the tape, but merely argued that it should not be received because it had not been produced prior to trial. In all the circumstances, it was well within the trial court's discretion to receive the tape in evidence after more than a week had elapsed since defendants' inspection of it.

### 2. *Hearsay or "Other Crimes"*

Giraldo also contends that the court should have excluded the answering machine tape on the ground that the statements recorded on it were hearsay inadmissible under Fed.R.Evid. 802 or were evidence of other crimes inadmissible under Fed.R.Evid. 404(b). Neither argument was made at trial, and hence both have been waived. *See, e.g., United States v. Carson*, 702 F.2d 351, 369 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 2457, 77 L.Ed.2d 1335 (1983); *United States v. DeFillipo*, 590 F.2d 1228, 1236–37 (2d Cir.), *cert. denied*, 442 U.S. 920, 99 S.Ct. 2844, 61 L.Ed.2d 288 (1979). Even if timely objections had been made on these grounds, however, we would find them without merit.

■ The contention that the tape-recorded statements were evidence of other

crimes ignores the fact that one of the offenses with which Giraldo was charged was conspiracy to possess cocaine with intent to distribute it. This charge was not limited to the aborted attempt to sell cocaine to Johnson, and statements that could be interpreted as orders for cocaine were evidence supporting an element of the very crime with which Giraldo was charged, irrespective of whether they might have been evidence of other crimes as well. The evidence was thus not excludable under Rule 404(b).

■ Nor were the tape-recorded statements hearsay, for they presumably were not offered to prove the truth of the matters asserted therein and were admissible to prove that the statements were in fact made, in order to show that it was more likely than not that the cocaine possessed by Giraldo was possessed for purposes of distribution. Thus, the statements fell outside the definition of hearsay. *See* Fed.R. Evid. 801(c).

### 3. *Interpretation*

■ Giraldo's final challenge with respect to the tape-recorded statements is that the government could not properly argue that they were coded orders for cocaine without having introduced evidence to that effect. We disagree.

The recorded statements purported to be orders for chicken and bread; but two of these statements ordered a quantity—one piece of bread—that themselves cast doubt on the straightforwardness of the statements. Further, there is no indication in the record that there was any type of food distribution business going on in Giraldo's apartment. There was, however, ample evidence of a large-scale narcotics operation, as nearly two kilograms of cocaine and $72,000 in cash, along with narcotics equipment, were found in the apartment. Further, the evidence revealed surreptitiousness on the part of Giraldo, who had rented the apartment under an alias and who possessed documents containing numbers recorded cryptically. In light of all the evidence, it was permissible for the government to argue that the jury should infer that the recorded statements were coded orders not for bread and chicken but rather

for the inventory Giraldo had on hand, namely cocaine. *Cf. United States v. Washington,* 677 F.2d 394, 396 (4th Cir.) (prosecutor entitled to argue plausible inferences as to narcotics business operations, without need for expert testimony), *cert. denied,* 459 U.S. 854, 103 S.Ct. 120, 74 L.Ed.2d 105 (1982).

The district court properly instructed the jury that the arguments of counsel are not evidence and that it was the job of the jury to decide what inferences to draw. We see no error with respect to the challenged portion of the summation.

### C. *Sufficiency of the Evidence*

■ Finally, in a letter filed in lieu of a reply brief, Giraldo appears to challenge the sufficiency of the evidence to convict him of conspiracy. The challenge is meritless.

In contending that the evidence was insufficient to support his conviction, a defendant bears a heavy burden. *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). In reviewing such a contention, we must credit every inference that could have been drawn in the government's favor, *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983), and we must affirm the conviction as long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt. *United States v. Taylor,* 464 F.2d 240, 244–45 (2d Cir.1972). These principles apply whether the evidence under review is direct or circumstantial. *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Giraldo has failed to meet his burden.

As direct evidence, Mesa identified "Tony" as Giraldo and testified that Giraldo personally had supplied him with the five kilos of cocaine for delivery to Johnson. Consistent with this testimony, the circumstantial evidence included proof that "Tony" or "Tono"—easily construable as a nickname for Antonio, which is Giraldo's middle name—used the address of an apartment rented by Giraldo and occupied by Giraldo, his wife, and his young daugh-

ters; that the telephone number Johnson was given to call in order to obtain confirmation that Mesa had the cocaine was that of Giraldo; that a man's voice answering that number advised Johnson that Mesa would be at the agreed meeting place; that just before that meeting, Mesa went to Giraldo's apartment and there filled a flight bag that he placed in the trunk of Ramos's car; that the flight bag removed from Ramos's trunk contained cocaine; and that when the officers searched Giraldo's apartment, Giraldo led them to an open safe containing large quantities of cocaine and cash and to a closet containing narcotics paraphernalia. This evidence was ample to permit a rational juror to find beyond a reasonable doubt that Giraldo was a member of the alleged conspiracy to distribute cocaine.

## CONCLUSION

We have considered all of Giraldo's challenges to his conviction and have found them to be without merit. The judgment of the district court is affirmed.