UNITED STATES of America, Appellee,

v.

J. Michael ROBILOTTO, Louis D. Spagnola and Anthony V. Civitello, Defendants-Appellants.

Nos. 1015, 1016, 1313, Dockets 86–1513, 86–1514, 86–1515.

United States Court of Appeals, Second Circuit.

Argued May 26, 1987.

Decided Sept. 11, 1987.

Mark M. Baker, New York City (Barry Ivan Slotnick, Arthur J. Viviani, Slotnick and Baker, New York City, of counsel), for defendant-appellant J. Michael Robilotto.

John L. McMahon, Saratoga Springs, N.Y., for defendant-appellant Louis D. Spagnola.

Anthony V. Civitello, pro se.

Frank J. Marine, U.S. Dept. of Justice, Washington, D.C. (Frederick J. Scullin, Jr., U.S. Atty., Syracuse, N.Y., Kevin E. McCormack, U.S. Dept. of Justice, Syracuse, N.Y., of counsel), for appellee U.S. of America.

Before FEINBERG, Chief Judge, LUMBARD and MINER, Circuit Judges.

MINER, Circuit Judge:

Defendants-appellants J. Michael Robilotto, Louis D. Spagnola and Anthony V. Civitello appeal from judgments of the United States District Court for the Northern District of New York (Gagliardi, J.), convicting them of various offenses arising from their association with Local Union No. 294 of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("Local 294"). Each appellant was charged with various counts of a 50-count superseding indictment, including substantive RICO violations, 18 U.S.C. § 1962(c) (1982); RICO conspiracy, id. § 1962(d); Hobbs Act conspiracy and substantive Hobbs Act violations, id. § 1951; mail fraud, id. § 1341; receiving benefits to influence the operation of an employee welfare plan, id. § 1954; receiving illegal payments as an employee representative, 29 U.S.C. § 186(b)(1) (1982); conspiracy to misapply bank funds and to make false book entries and false statements in credit applications, see 18 U.S.C. § 371 (1982); and filing false federal income tax returns, 26 U.S.C. § 7206(1) (1982).

On appeal, Robilotto contends primarily that the Hobbs Act count on which he was convicted failed to state a criminal offense. He also challenges the sufficiency of the evidence to support his convictions for extortionate conspiracy and for receiving benefits to influence the operation of an employee welfare plan. He argues as well for reversal of his RICO convictions on the ground that there was an insufficient nexus between the pattern of racketeering shown and the affairs of the charged enterprise. Spagnola challenges the district court's entry of a RICO forfeiture judgment against him. Civitello claims primarily that the charges against him were barred by the applicable statute of limitations. We affirm.

## I. BACKGROUND

Although appellants raise numerous claims, only a few merit discussion. We summarize below only those facts necessary for a full understanding of the discussion that follows. The evidence adduced at trial demonstrated the existence of two criminal schemes pertinent to this appeal. The first scheme had its genesis in the negotiations for a collective bargaining

agreement between Universal City Studios ("Universal") and Local 294 to supply drivers in connection with production of the film, "Ghost Story." Robilotto served as a business agent for Local 294 on the film.[1] Civitello acted as a job steward and captain for Local 294 on the film and Spagnola acted as an assistant or co-steward and co-captain.[2] The second scheme involved efforts by Robilotto and Spagnola to obtain loans from the Fulton County National Bank, in exchange for which Robilotto agreed to arrange for substantial deposits in the bank from the Albany Area Trucking and Allied Industries Health and Welfare Fund ("Health and Welfare Fund").

A. *The Cover Driver Scheme*

After some preliminary negotiations, Robert Brown, a production manager employed by Universal, came to the Albany, New York area in November 1980 to prepare for filming of the motion picture "Ghost Story." Brown met with Civitello to negotiate an agreement with Local 294 to use local teamster drivers on the film. Brown and Civitello reached agreement as to wages and fringe benefits. Civitello then proposed that Universal hire local drivers as "cover drivers" for some of the jobs that were to be performed by the Los Angeles drivers accompanying the preproduction team from California. The term "cover driver," as defined by appellants, refers to hiring a local union member to "cover" for a job that actually is performed by a union member from another jurisdiction. Thus, the employer must hire two workers for the same job, when the work is performed solely by the employee from a foreign jurisdiction. The cover driver thereby receives an unearned salary. Brown initially balked at the proposal. He told Civitello that he never had used cover drivers and that he had no jobs for them to do. Civitello responded that Universal was

required to hire cover drivers if it expected to employ teamsters on the motion picture and if it expected to be able to film it in the Albany area. Civitello also suggested the possibility of a work stoppage if cover drivers were not hired. Brown agreed to hire four cover drivers.

Filming began in January 1981. In April 1981, Daniel Slusser, a vice president and general manager of Universal, became aware that cover drivers were being paid by Universal in connection with the filming of "Ghost Story." Slusser also discovered that these cover drivers were doing no work and that several of the drivers, e.g., Irene Civitello, Frank Civitello and Donna Spagnola, apparently were related to some union officials. In fact, many of the cover drivers hired were not union members and were incapable of performing the jobs that they purportedly were covering. Slusser telephoned instructions to several Universal executives that payments to all cover drivers should cease. These instructions were conveyed to Civitello, who then spoke to Slusser. Slusser informed him that the cover drivers would be required to work and would not be paid unless they worked. Civitello responded that Slusser would have to speak to Robilotto.

Later that day, all three appellants met with William Gray, a production supervisor, who repeated that Universal would not pay for non-working cover drivers. Robilotto became angry and began swearing, threatening that they would either pay or he would "shut them down." Gray then arranged for Robilotto to speak to Slusser. Robilotto repeated his threat to Slusser. Slusser agreed to meet with Robilotto in Arizona. The meeting took place in May 1981 and lasted for approximately 15 minutes. After the meeting, Slusser called a Universal executive and told him to continue paying the cover drivers for the remaining two weeks of filming.

---

**1.** A business agent's duties include negotiating collective bargaining agreements and working conditions, handling union members' grievances, appointing and supervising shop stewards and selecting the union members to be employed.

**2.** A steward's duties include settling grievances from union members on a job site and reporting unresolved grievances to the business agent. A captain coordinates the employer's transportation needs, including supplying vehicles, hiring drivers and directing the drivers to their assigned tasks.

At trial, both Brown and Gray testified that they felt threatened by Civitello and Robilotto respectively, and that they paid the cover drivers only in response to those threats. Four cover drivers also testified, including Irene Civitello, ex-wife of appellant Civitello, and several long-time friends of Spagnola. Each testified that they received little or no money from Universal, and several testified that Spagnola had gotten them jobs to facilitate their repayment to him of gambling debts. Universal paid a total of approximately $50,000.00 for the "services" of these four cover drivers.

### B. *The Bank Loan Scheme*

In July 1981, Robilotto and Spagnola contacted Charles Moyses, then vice-president of Fulton County National Bank and an unindicted coconspirator in this case, informing him that they were connected to the local teamsters union and requesting a loan of $150,000.00 to purchase a restaurant in Saratoga Springs, New York. Moyses informed them that it would be necessary to deposit $100,000.00 in the bank in connection with the loan, and asked if they could get deposits from their union. Robilotto responded affirmatively. He later called Moyses to inform him that Health and Welfare Fund certificates of deposit would be transferred to the bank when they matured. Robilotto also told him that Herbert Bender, who was an official of the Health and Welfare Fund, would arrange the transfers. Shortly thereafter, Bender called Moyses to inform him that $300,000.00 would be wired to the bank. That deposit was made in December 1981. On at least two other occasions, Spagnola and Robilotto obtained loans from the bank conditioned on further union deposits. On both occasions, further Health and Welfare Fund deposits were made. Moyses testified at trial that the entire series of loans to Robilotto and Spagnola, totalling more than $474,000.00 over the course of a year, had been approved because Robilotto had arranged for substantial deposits in the Fulton County National Bank from the Health and Welfare Fund.

In his defense, Robilotto offered testimony from John C. Peet, Jr., a trustee of the Health and Welfare Fund, as to the Fund's decision to transfer deposits to the Fulton County National Bank, and from his wife, who testified that she was hired as a cover driver and performed work on the film. Civitello testified in his own behalf. Spagnola did not testify and called no witnesses.

After a two-week jury trial, appellants were found guilty on all 50 counts. Spagnola and Robilotto were sentenced to a total of four years' imprisonment and Civitello was sentenced to a total of six years' imprisonment. In addition, judgments of forfeiture were entered against all three appellants. Robilotto was ordered to forfeit to the United States $107,354.00, to be paid as restitution to the Fulton County National Bank, and to forfeit his position as business agent for Local 294. Civitello was ordered to forfeit $27,940.00 to the government. Spagnola was ordered to make restitution to his victims in the amount of $143,439.00 and to forfeit $173,-260.00 to the United States. This appeal followed.

### II. DISCUSSION

### A. *Robilotto's Claims*

#### 1. *Hobbs Act*

Robilotto's primary contention on appeal is that the government's Hobbs Act charge failed to state a criminal offense and that the evidence was insufficient to support his conviction on that charge. We disagree.

The Hobbs Act, 18 U.S.C. § 1951, proscribes extortion affecting interstate commerce, as well as attempts and conspiracies to do so. Extortion, as defined in the Act, means "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence or fear." *Id.* § 1951(b)(2). Wrongfully induced fear includes fear of economic loss that would result from work stoppages or strikes. *United States v. Clemente*, 640 F.2d 1069, 1078 (2d Cir.), *cert. denied*, 454 U.S. 820, 102 S.Ct. 102, 70 L.Ed.2d 91 (1981); *United States v. Palmiotti*, 254 F.2d 491, 495–96 (2d Cir.1958); *United States v. Postma*, 242 F.2d 488, 493

(2d Cir.), *cert. denied,* 354 U.S. 922, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957); *United States v. Varlack,* 225 F.2d 665, 669 (2d Cir.1955); *see also United States v. Capo,* 817 F.2d 947, 951 (2d Cir.1987) (in banc) (listing elements of wrongfully induced fear of economic loss).

In *United States v. Enmons,* 410 U.S. 396, 93 S.Ct. 1007, 35 L.Ed.2d 379 (1973), the Supreme Court "carved out a labor exception to the traditional law of extortion codified in the Hobbs Act." *United States v. Zappola,* 677 F.2d 264, 269 (2d Cir.), *cert. denied,* 459 U.S. 866, 103 S.Ct. 145, 74 L.Ed.2d 122 (1982). The Court held that, in a labor context, the Hobbs Act "does not apply to the use of force to achieve legitimate labor ends." *Enmons,* 410 U.S. at 401, 93 S.Ct. at 1010. However, the Supreme Court emphasized that when labor union officials use force for a wrongful purpose, e.g., to obtain wages for "imposed, unwanted, superfluous and fictitious services of laborers," prosecution would be appropriate under the Hobbs Act. *Id.* at 408, 93 S.Ct. at 1014 (quoting *United States v. Green,* 350 U.S. 415, 417, 76 S.Ct. 522, 524, 100 L.Ed. 494 (1956)).

Although Robilotto faults the district court's failure to charge the jury with regard to his so-called *Enmons* defense, he does not urge reversal of his conviction for Hobbs Act conspiracy on that ground. Rather, Robilotto asserts that his conviction should be reversed based on his contention that *Enmons* demonstrates the inapplicability of the Hobbs Act to the instant case. Robilotto's argument is unconvincing.

 Apparently conceding that the cover drivers were both superfluous and fictitious, Robilotto argues that the demand to pay cover drivers was neither imposed upon, nor unwanted by, Universal because Universal eventually "agreed" to pay the cover drivers. However, Universal consented to payment of those salaries only after threats of labor unrest made by Civitello and later by Robilotto. Under Robilotto's singularly circular logic, once Universal consented to making extortionate payments upon pain of labor strife, that consent would then evidence Universal's willingness to accept the previously unwanted contract term. At most, Universal's subsequent agreement to hire the cover drivers demonstrates only that appellants' extortion was successful. Moreover, the cover drivers at issue here, for the most part, were not members of the union, performed no work, and were incapable of performing the jobs that they purportedly were covering. It would be difficult to imagine a more obvious instance of imposed, unwanted, superfluous and fictitious labor services. *See United States v. Green,* 350 U.S. 415, 417, 76 S.Ct. 522, 524, 100 L.Ed. 494 (1956). Appellants' attempts to force Universal to hire cover drivers clearly fall within the type of illegitimate labor activity proscribed in *Green.* We hold, therefore, that the Hobbs Act indictment against appellants stated a criminal offense, and that the exception envisioned in *Enmons* for legitimate union activity is inapplicable to the instant case.

Robilotto also claims that the evidence was insufficient to support his conviction for Hobbs Act conspiracy. Under the well-established standards for challenges to sufficiency of the evidence, a defendant bears a heavy burden. *United States v. Losada,* 674 F.2d 167, 173 (2d Cir.), *cert. denied,* 457 U.S. 1125, 102 S.Ct. 2945, 73 L.Ed.2d 1341 (1982). "A jury's verdict will be sustained if there is substantial evidence, taking the view most favorable to the government, to support it." *United States v. Nersesian,* 824 F.2d 1294, 1324 (2d Cir. 1987) (citation omitted). The reviewing court "must credit every inference that could have been drawn in the government's favor," *United States v. Giraldo,* 822 F.2d 205, 213 (2d Cir.1987) (citation omitted), and must "affirm the conviction as long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt," *id.* (citations omitted). Robilotto has failed to meet this burden.

 The evidence adduced at trial amply supports Robilotto's conviction for Hobbs Act conspiracy. The evidence demonstrates that Brown was induced to pay for

unwanted cover drivers by direct threats of labor unrest from coconspirator Civitello. Brown testified that he agreed to pay the cover drivers solely because he feared costly work stoppages. There was ample evidence that Robilotto exploited this fear by threatening Gray and Slusser with work stoppages when they expressed Universal's desire to discontinue payments to "no-show" cover drivers. Gray testified that he feared labor strife as a result of Robilotto's threats. The evidence also sufficiently established that Robilotto knowingly joined the conspiracy to extort money from Universal. Robilotto was the business agent for the union on the film and assigned Civitello to be the job steward for the film. Upon learning that Universal no longer wished to pay for the unwanted cover drivers, Robilotto repeated Civitello's extortionate threats to Universal in strong terms. In light of the foregoing and of all of the evidence presented, the jury was entitled to infer that Robilotto was acting in concert with Civitello as part of a conspirational agreement to extort money from Universal. *See United States v. Alessi*, 638 F.2d 466, 475–76 (2d Cir.1980).

2. *Receiving Benefits to Influence the Operation of an Employee Welfare Plan*

Robilotto contends that his conviction under 18 U.S.C. § 1954 should be overturned because there was insufficient evidence that he exercised control over the Health and Welfare Fund, and that loans extended solely to Spagnola should not have been included in the charges against him. We disagree.

■ Section 1954 prohibits an agent or officer of an employee organization, any of whose members are covered by an employee welfare benefit plan, from receiving "any ... loan, money, or thing of value because of or with intent to be influenced with respect to, any of [his] actions, decisions, or other duties relating to any question or matter concerning such plan." 18 U.S.C. § 1954. This statutory proscription extends to "all persons who exercise control, direct or indirect, authorized or unau-

thorized[,] over the fund," *United States v. Palmeri*, 630 F.2d 192, 199 (3d Cir.1980), *cert. denied*, 450 U.S. 967 & 983, 101 S.Ct. 1484 & 1520, 67 L.Ed.2d 616 & 819 (1981); *see United States v. Friedland*, 660 F.2d 919, 925 (3d Cir.1981), *cert. denied*, 456 U.S. 989, 102 S.Ct. 2268, 73 L.Ed.2d 1283 (1982), including business agents of a local union who exercise influence over employee welfare benefit funds. *Palmeri*, 630 F.2d at 198–200.

■ Undisputed evidence demonstrated that Robilotto, as business agent for Local 294, was a union officer or agent covered by section 1954 and that the Health and Welfare Fund was an employee welfare benefit plan within the purview of the statute. Robilotto contends essentially that there was no evidence that he wielded sufficient influence to cause Health and Welfare Fund deposits to be made at the Fulton County National Bank. His argument fails for two reasons. First, section 1954, on its face, does not necessarily require proof that the malefactor actually possessed the ability to influence a welfare fund's investment decisions. The statute prohibits a union officer from accepting anything of value "because of or with intent to be influenced with respect to" any of his actions, decisions or duties concerning the fund. This statutory language has been interpreted to proscribe "acceptance of payment with the stated purpose of exercising one's influence ..., regardless of capacity to do so." *United States v. Soures*, 736 F.2d 87, 90 (3d Cir.1984) (construing *Friedland*, 660 F.2d at 925–26), *cert. denied*, 469 U.S. 1161, 105 S.Ct. 914, 83 L.Ed.2d 927 (1985); *cf. United States v. Romano*, 684 F.2d 1057, 1064 (2d Cir.) (statute prohibits receipt of things of value resulting from union pension fund investment decisions, regardless whether receipt involved corrupt transaction), *cert. denied*, 459 U.S. 1016, 103 S.Ct. 375, 74 L.Ed.2d 509 (1982). The evidence adduced at trial amply demonstrates that Robilotto's stated intention was to influence the Health and Welfare Fund's investment decisions when he accepted the loans from Moyses. Moyses testified that Robilotto told him in a telephone conversation that Health and

Welfare Fund certificates of deposit would be transferred to the bank and that Herbert Bender, a Health and Welfare Fund official, would call to arrange the transfer. This testimony amply supports the jury verdict.

Second, the evidence adduced at trial clearly supports a finding that Robilotto did, in fact, influence the Health and Welfare Fund's investment decisions. Moyses testified that, shortly after his telephone conversation with Robilotto, Bender left a message for Moyses stating that a deposit of $300,000 would be wired to the Fulton Bank. That deposit was made in December 1981. On two later occasions, the Health and Welfare Fund made deposits of $100,000 after Robilotto and Spagnola were advised that further deposits were necessary to obtain additional personal loans.

■■■ Robilotto contends that, because Moyses referred in his testimony to Robilotto's promise to supply "union funds" in exchange for loans, the evidence failed to show that Robilotto promised Health and Welfare Fund deposits. However, it is obvious from even the most cursory review of the testimony that Moyses used the terms "union funds" and "Health and Welfare Funds" interchangeably. Moreover, Moyses testified at one point that Robilotto claimed to have arranged for deposits to be made from the Health and Welfare Fund. *See* Trial Transcript at 1324. There is a clear pattern of demands for loans, followed by promises of deposits, followed closely by deposits of Health and Welfare Fund assets.

■■■ Robilotto's claim that there was insufficient evidence to support the jury verdict under section 1954 involving the loans to Spagnola requires scant discussion. Contrary to Robilotto's contention, the evidence clearly shows that Robilotto was the central figure in the loan scheme—he initiated the entire scheme, knowingly enabled Spagnola to obtain loans contingent upon Health and Welfare Fund deposits, participated in discussions regarding the Spagnola loans, and received the proceeds from some of them. Accordingly, there was sufficient evidence to convict

Robilotto as a principal. In addition to Robilotto's receipt of the proceeds of some of the loans, his ability to control the disposition of loans to Spagnola can be considered "a thing of value" under section 1954. *See United States v. Schwartz*, 785 F.2d 673, 681 (9th Cir.) ("Congress clearly intended the scope of *thing of value* to include intangibles"), *cert. denied,* — U.S. ——, 107 S.Ct. 290, 93 L.Ed.2d 264 (1986); *cf. United States v. Girard*, 601 F.2d 69, 71 (2d Cir.) (phrase "thing of value" generally is construed to cover intangibles), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979).

### 3. *Substantive RICO and RICO Conspiracy*

Robilotto contends that the predicate acts relating to the bank loans, charged in both the substantive RICO and RICO conspiracy counts, were insufficiently related to Local 294, the charged RICO enterprise. Therefore, according to Robilotto, because only one other predicate act—the Hobbs Act charge—properly could be alleged as part of a pattern of racketeering activity, his RICO convictions must be reversed. We reject Robilotto's contentions.

Under section 1962(c), it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). Conspiracies to violate section 1962(c) also are proscribed. *Id.* § 1962(d). Unions expressly are included in the statutory definition of the term "enterprise." *Id.* § 1961(4) (1982). Although the statute itself does not specify "the degree of interrelationship between the pattern of racketeering and conduct of the enterprise's affairs," *United States v. Scotto*, 641 F.2d 47, 54 (2d Cir.1980), *cert. denied,* 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981), we previously have identified two situations that would fall within the statutory proscription: first, when a defendant "is enabled to commit the predicate offenses

*solely by virtue of his position in the enterprise* or involvement in or control over the affairs of the enterprise," *id.* (emphasis added); or second, when "the predicate offenses are related to the activities of that enterprise," *id.* *See United States v. LeRoy,* 687 F.2d 610, 617 (2d Cir.1982) (section 1962(c) "does not require that predicate acts be in furtherance of the enterprise"), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983); *see also United States v. Provenzano,* 688 F.2d 194, 200 (3d Cir.), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 492, 74 L.Ed.2d 634 (1982); *cf. United States v. Cauble,* 706 F.2d 1322, 1332–33 (5th Cir.1983) (adding requirement that predicate acts had some effect on the enterprise), *cert. denied,* 465 U.S. 1005, 104 S.Ct. 996, 79 L.Ed.2d 229 (1984).

■ Robilotto argues that the government failed to demonstrate a nexus between the bank loans procured as a result of promises of Health and Welfare Fund deposits and the affairs of Local 294. However, there was abundant evidence that the Fulton County National Bank extended the loans to Robilotto and Spagnola solely because Robilotto claimed, as a result of his position as a business agent for Local 294, to have the ability to secure large deposits from the Health and Welfare Fund. As discussed above, the evidence strongly supports the conclusion that Robilotto, in fact, used his influence to secure the Health and Welfare Fund deposits. Clearly, therefore, the charges relating to the bank loans properly were included as predicate acts, and Robilotto's substantive RICO and RICO conspiracy convictions were appropriate.

## B. *Spagnola's Claims*

The majority of Spagnola's claims are made without citation to legal authority or to the record, and are, in any event, without merit. We therefore will address only his claim that the district court erred in granting a judgment of forfeiture against him.

Upon sentencing, the district court entered a judgment of forfeiture of the monetary proceeds of Spagnola's illegal racketeering activity. In his brief to this court, Spagnola contends that the judgment is invalid because he no longer retains those ill-gotten funds. Spagnola's contention is premised upon his erroneous belief that the government should be required to trace the proceeds of his racketeering activities to identifiable assets and establish that he had the proceeds at the time of forfeiture.

■ The RICO forfeiture provision in effect at the time Spagnola committed the offenses for which he was convicted, *see United States v. Lizza Indus., Inc.,* 775 F.2d 492, 497 n. 3 (2d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1459, 89 L.Ed.2d 716 (1986), provided that a person convicted under section 1962 "shall forfeit to the United States (1) any interest he has acquired or maintained in violation of section 1962." 18 U.S.C. § 1963(a)(1) (1982) (amended by Comprehensive Crime Control Act of 1984, Pub.L. No. 98–473, tit. II, § 302, 98 Stat. 2040 (1984)). "Interest," within the meaning of the pre-amendment version of section 1963(a), included proceeds and profits received as a result of racketeering activity, *Russello v. United States,* 464 U.S. 16, 22, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983), as the amendments to section 1963 make clear, *see* 18 U.S.C. § 1963(a)(3) (Supp. III 1985).

■ Section 1963, unlike other forfeiture statutes, imposes forfeiture "directly on an individual as part of a criminal prosecution rather than in a separate proceeding in rem against the property subject to forfeiture." *United States v. Huber,* 603 F.2d 387, 396 (2d Cir.1979), *cert. denied,* 445 U.S. 927, 100 S.Ct. 1312, 63 L.Ed.2d 759 (1980). *See, e.g., United States v. Busher,* 817 F.2d 1409, 1412 n. 4 (9th Cir.1987); *United States v. Kravitz,* 738 F.2d 102, 106 (3d Cir.1984), *cert. denied,* 470 U.S. 1052, 105 S.Ct. 1752, 84 L.Ed.2d 816 (1985); *Cauble,* 706 F.2d at 1349. "Since RICO forfeiture is a sanction against the individual defendant rather than a judgment against the property itself, 'it follows the defendant as a part of the penalty and thus it does not require that the government trace it, even though the forfeiture is not due until after convic-

tion.'" *United States v. Ginsburg*, 773 F.2d 798, 801 (7th Cir.1985) (in banc) (quoting *United States v. Conner*, 752 F.2d 566, 576 (11th Cir.), *cert. denied*, 474 U.S. 821, 106 S.Ct. 72, 88 L.Ed.2d 59 (1985)), *cert. denied*, 475 U.S. 1011, 106 S.Ct. 1186, 89 L.Ed.2d 302 (1986); *see also Lizza Indus., Inc.*, 775 F.2d at 499 (Van Graafeiland, J., concurring in part and dissenting in part on other grounds) ("[t]he question whether the proceeds of illegal activity must still be in existence in order to be subject to forfeit ... is now generally answered in the negative"); *cf. United States v. Amend*, 791 F.2d 1120, 1127 n. 6 (4th Cir.) (applying *Ginsburg* rationale to continuing criminal enterprise forfeiture under 21 U.S.C. § 853(c) (Supp. III 1985)), *cert. denied*, — U.S. ——, 107 S.Ct. 399, 93 L.Ed.2d 353 (1986). Because the forfeiture imposed upon Spagnola is *in personam*, the government need not trace the proceeds of Spagnola's racketeering activities to identifiable assets.[3] The judgment of forfeiture, therefore, is valid. In addition, although Spagnola alleged that the judgment of forfeiture was violative of the eighth amendment, he has failed to identify any eighth amendment violation arising from the forfeiture, and none is apparent to us. *See Lizza Indus., Inc.*, 775 F.2d at 498; *Huber*, 603 F.2d at 397.

### C. *Civitello's Claims*

Civitello claims that the charges against him were barred by the applicable five-year statute of limitations, 18 U.S.C. § 3282 (1982), because many of his alleged criminal acts occurred more than five years prior to April 24, 1986, the date on which the superseding indictment was filed. These acts, for the most part, occurred less than five years prior to March 14, 1986, the date on which the initial indictment was filed. Civitello's argument evinces a misunderstanding of the well-established standards for evaluating statute of limitations claims involving superseding indictments. "Once an indictment is brought, the statute of

limitations is tolled as to the charges contained in that indictment." *United States v. Grady*, 544 F.2d 598, 601 (2d Cir.1976) (citations omitted). If brought during the valid pendency of the initial indictment, a superseding indictment containing substantially the same charges as the superseded indictment "should have no effect on the initial tolling of the statute of limitations so long as the defendant is not significantly prejudiced by the delay." *United States v. Panebianco*, 543 F.2d 447, 454 (2d Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977).

[14] Here, the superseding indictment made only minor technical changes to the indictment. In addition, Civitello has alleged no prejudice arising from the filing of the superseding indictment, and we perceive no such prejudicial effect. We hold, therefore, that the charges against Civitello properly were measured as of the filing date of the initial indictment.

▉▉▉▉▉ Civitello's remaining claims require little discussion. First, the testimony of Irene Civitello, appellant's ex-wife, did not violate the privilege against adverse spousal testimony because she did not testify about any confidential marital communications. *See, e.g., Pereira v. United States*, 347 U.S. 1, 6, 74 S.Ct. 358, 361, 98 L.Ed. 435 (1954); *United States v. Estes*, 793 F.2d 465, 467 (2d Cir.1986). Second, Civitello's motion for severance due to his lack of participation in the bank loan scheme properly was denied. The substantial evidence against him could be considered separately, and he failed to demonstrate any prejudice arising from the joinder of defendants in this case. *See United States v. Garza*, 664 F.2d 135, 142–43 (7th Cir.1981), *cert. denied*, 455 U.S. 993, 102 S.Ct. 1620, 71 L.Ed.2d 854 (1982); *see also United States v. Toliver*, 541 F.2d 958, 963 (2d Cir.1976). Finally, Civitello's claim that he was denied the effective assistance of counsel is predicated on his belief that counsel should have raised the aforemen-

---

3. We note in passing that Spagnola's sole contention at oral argument was that the judgment of forfeiture constituted a "bill of attainder." Because Spagnola's ill-conceived "bill of attain-

der" argument was inadequately presented at oral argument and is, in any event, without merit, we have elected to address only those contentions raised in his brief.

tioned claims. Since we find those claims to be without merit, we similarly reject his claim of ineffective assistance.

## III. CONCLUSION

We have examined carefully appellants' remaining claims and find them to be without merit. The judgments of the district court are, in all respects, affirmed.