16-3329-cr
United States v. Kirsch

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term, 2017
No. 16-3329-cr

UNITED STATES OF AMERICA,
*Appellee*,

*v.*

MARK N. KIRSCH
*Defendant-Appellant*,

CARL A. LARSON, MICHAEL J. CAGGIANO, JEFFREY C. LENNON,
GERALD H. FRANZ, JR., JAMES L. MINTER, III, JEFFREY A. PETERSON,
KENNETH EDBAUER, GEORGE DEWALD, MICHAEL J. EDDY, THOMAS
FREEDENBERG, GERALD E. BOVE,
*Defendants.*[*]

_____

Appeal from the United States District Court
for the Western District of New York.
No. 07-cr-00304 — William M. Skretny, *Judge*.

_____

[*] The Clerk of Court is directed to amend the caption as set forth above.

ARGUED: SEPTEMBER 25, 2017
DECIDED: SEPTEMBER 12, 2018

Before: LOHIER and DRONEY, *Circuit Judges*, and RAKOFF, *District Judge*.[**]

Appeal from a judgment of conviction of the United States District Court for the Western District of New York (Skretny, *J.*). Mark N. Kirsch, a union local president, was convicted of racketeering conspiracy and Hobbs Act extortion conspiracy for his efforts to force non-union contractors to hire union members. On appeal, Kirsch contends that: (1) the *Enmons* exception to the Hobbs Act for the pursuit of lawful union objectives applies, requiring reversal of his Hobbs Act conspiracy conviction; (2) an *Enmons*-like exception exists with respect to New York Penal Law extortion, requiring reversal of his racketeering conviction based on state law predicate acts; (3) the wages that he was convicted of attempting to extort are not "property" capable of being extorted, requiring reversal of both convictions; (4) his Hobbs Act conspiracy conviction must be reversed because the Government failed to prove his involvement in the charged conspiracy; and (5) the district court erred in instructing the jury as to the required mental state for threats. We conclude that (1) an *Enmons*-like exception does not apply to New York Penal Law extortion; (2) the wages Kirsch attempted to extort were "property" capable of being extorted; (3) the district court's threat instruction was correct with respect to New York Penal Law extortion; but (4) the Government failed to prove Kirsch's involvement in the charged Hobbs Act conspiracy. Accordingly, we **REVERSE** the count of

[**] Judge Jed. S. Rakoff, United States District Court for the Southern District of New York, sitting by designation.

conviction for Hobbs Act conspiracy, **AFFIRM** the count of conviction for racketeering conspiracy, and **REMAND** for resentencing.

_____

MONICA J. RICHARDS, Assistant United States Attorney, *for* James P. Kennedy, Jr., United States Attorney for the Western District of New York, Buffalo, NY, *for Appellee.*

BRIAN M. MELBER, Personius Melber LLP, Buffalo, NY, *for Defendant-Appellant.*

DRONEY, *Circuit Judge*:

In 2016, Appellant Mark N. Kirsch was convicted of Hobbs Act extortion conspiracy and racketeering conspiracy based on predicate acts of New York Penal Law extortion violations. The jury concluded that Kirsch, the president of the local chapter of a labor union, used threats of violence and destruction of property in an attempt to force contractors to hire members of his union.

On appeal, Kirsch argues that *United States v. Enmons*, 410 U.S. 396 (1973), shields him from Hobbs Act liability, requiring that his

3

Hobbs Act conspiracy conviction be reversed. In *Enmons*, the Supreme Court held that a union official could not be convicted of Hobbs Act extortion if the official's conduct was undertaken in pursuit of "legitimate union objectives." *Id.* at 400. With respect to the racketeering conspiracy conviction, Kirsch contends that an *Enmons*-like exception exists under New York law that shields him from New York Penal Law extortion liability, also requiring the reversal of that count of conviction. He also maintains that (1) the property he was charged with extorting—wages and benefits for union members—was not "transferable," as required by *Sekhar v. United States*, 570 U.S. 729 (2013); (2) the Government presented insufficient evidence of his involvement in the charged Hobbs Act conspiracy; and (3) the district court's instructions regarding the required mental state for threats for the extortion charges were incorrect.

We hold that (1) under New York Penal Law, there is no *Enmons*-like exception for extortion committed in pursuit of a

4

legitimate labor objective; (2) the property Kirsch was convicted of extorting was "transferable" as required by *Sekhar*; (3) the district court's instructions with respect to extortion under the New York Penal Law were correct; but (4) the Government presented insufficient evidence of Kirsch's involvement in the charged Hobbs Act conspiracy. Because we hold that the government presented insufficient evidence to support the Hobbs Act conviction, we need not reach Kirsch's argument that *Enmons* shields him from Hobbs Act liability. As a result, Kirsch's conviction for racketeering conspiracy is affirmed, and his conviction for Hobbs Act extortion conspiracy is reversed.

**BACKGROUND**

Kirsch was the president and business manager of the International Union of Operating Engineers – Local 17 ("Local 17") from 1997 to 2008. Local 17 operated in the Buffalo, New York area. At trial, the government presented evidence that Kirsch instructed

Local 17 members to "turn or burn" contractors who did not employ them, meaning that non-union contractors would have to hire Local 17 members ("turn") or the union would obstruct their work ("burn"). Union members, at the direction of Kirsch, picketed and blocked construction sites, threatened construction managers, tampered with equipment, and destroyed property.

Kirsch was charged with multiple counts of unlawful conduct with respect to numerous contractors. However, after the jury's verdict and his motion for judgment of acquittal was granted in part, Kirsch remains convicted only of Racketeering Conspiracy (18 U.S.C. § 1962(d)) under Count 1 for his role in attempting to extort two contractors—Ontario Specialty Contracting ("OSC") and Earth Tech—and Hobbs Act extortion conspiracy (18 U.S.C. § 1951(a)) under Count 2 with respect to conduct directed at a third contractor, Amstar Painting ("Amstar").[1] Accordingly, we limit our review to

---

[1] The jury acquitted Kirsch of two counts, but found Kirsch guilty of racketeering conspiracy, Hobbs Act conspiracy, and two counts of attempted Hobbs Act

those two counts of conviction and the circumstances involving those three contractors. We briefly summarize the evidence presented at trial as to those contractors.[2]

**I. OSC**

OSC is an environmental contractor that provides soil remediation services. In June 2005, OSC began a project at the waterfront in Buffalo to prepare the site for later construction. Before

extortion. As to the racketeering conspiracy count, the jury found that Kirsch had conspired to commit four predicate acts: (1) attempted Hobbs Act extortion ("Racketeering Act 4A") and (2) attempted extortion in violation of New York law ("Racketeering Act 4B") as to the OSC project, and (3) attempted Hobbs Act extortion ("Racketeering Act 5A") and (4) attempted extortion in violation of New York law ("Racketeering Act 5B") as to the Earth Tech project. After trial, the district court granted in part Kirsch's motion for a judgment of acquittal, acquitting Kirsch of the two counts of attempted Hobbs Act extortion. The Government did not cross-appeal the district court's dismissal of those counts. As discussed below, the district court also concluded that the related predicate acts, Racketeering Acts 4A and 5A, could not support the racketeering conspiracy count of conviction, but denied Kirsch's motion on that count because Racketeering Acts 4B and 5B were sufficient to sustain the conviction.

[2] While Count 2—Hobbs Act Conspiracy—alleges conduct with respect to contractors other than those three, the Government does not specifically rely on that other conduct to support Kirsch's conviction under Count 2.

7

such construction could begin, OSC was tasked with excavating contaminated material and transporting it to a disposal facility.

Before the contract was awarded to OSC, a Local 17 representative invited the owner of OSC, Jon Williams, to have lunch with him and Kirsch. Williams testified at trial that at the meeting, Kirsch stated that if OSC did not use Local 17 members for the project, OSC would not "get the project, and if [it] did get the project, [it]'d never get it done." Gov't App. 15. Despite Kirsch's demand that OSC employ Local 17 members, OSC refused. At a meeting before the project's ceremonial ground-breaking, Kirsch again threatened to stop the project. Local 17 then began picketing the site. During the picketing, Local 17 members prevented trucks from entering or leaving the worksite, and placed metal "stars" to puncture truck tires in the entranceway of the worksite. Additionally, on multiple occasions, OSC workers discovered upon arrival in the morning that

padlocks on the entrances to the site had been tampered with so that they could not be unlocked.[3]

**II. EARTH TECH**

In 2005, Earth Tech, also an environmental remediation company, entered into a $10 million contract to remove contaminated soil from a school in the Buffalo area. When Earth Tech refused to sign an agreement to hire Local 17 workers, Local 17 members began picketing the job site. In addition, Local 17 members blocked entrances to the site and placed metal stars and roofing nails by its entrance to damage tires of vehicles. As a result of this conduct, Earth Tech obtained an injunction to prevent further disruption at the worksite. When an Earth Tech project manager notified the picketers of the injunction, one of the Local 17 members threatened him. Later,

---

[3] There was evidence of additional instances of unlawful conduct by Local 17 directed at OSC employees: picketers told an OSC employee that they knew where he lived and threatened to throw a brick at his residence; a security guard was injured when picketers pushed a gate over on top of him; and a picketer threw a cup of hot coffee over the fence of the job site, hitting an OSC employee in the face.

as the project manager was leaving for the night, his car was surrounded by picketers; about an hour passed before he was permitted to leave.

### III.    AMSTAR

In September of 2003, Amstar, a painting contractor, was involved in a bridge rehabilitation project in Buffalo. After the project had begun, a Local 17 member, Edward Perkins, asked John Lignos, the vice president of Amstar, to assign a Local 17 worker to operate a compressor at the job site. The compressor did not actually require an operator, as "operating" it simply required turning it on in the morning and turning it off at the end of the day.[4] Lignos refused to hire a Local 17 member for that purpose.

When the Amstar employees arrived on the morning after Lignos told Perkins he would not hire a Local 17 member, they

---

[4] Had Lignos hired a Local 17 "operator," Amstar would have had to pay him for eight hours of work.

10

discovered that the diesel fuel line in the compressor had been cut, causing diesel fuel to spill into the asphalt, resulting in substantial cleanup and repair costs.

**PROCEDURAL HISTORY**

On December 18, 2007, a grand jury in the United States District Court for the Western District of New York indicted five members of Local 17—not including Kirsch—on charges of Hobbs Act extortion and conspiracy. On April 1, 2008, the grand jury returned a superseding indictment, adding additional counts and additional defendants, including Kirsch. A second superseding indictment—the operative indictment at trial—was returned on January 10, 2012. It included racketeering conspiracy and Hobbs Act extortion conspiracy charges.

Kirsch and his codefendants moved to dismiss the indictment, arguing—as relevant here—that the alleged threatening and violent conduct was undertaken to achieve legitimate union objectives and

11

thus could not constitute extortion under either the Hobbs Act or New York Penal Law. *See Enmons*, 410 U.S. at 400.[5] The district court concluded that *Enmons* did not shield Kirsch and his codefendants from liability, and denied the motion to dismiss.

Shortly after the Supreme Court decided *Sekhar*, and still before trial, Kirsch and his codefendants again moved to dismiss the indictment. Their second motion argued that the property that the indictment alleged was extorted was not "transferable," as required for Hobbs Act extortion by *Sekhar*. *See Sekhar*, 570 U.S. at 734. The district court concluded that while certain of the forms of property that the indictment alleged was extorted failed to satisfy *Sekhar*, two other forms of property alleged in the indictment satisfied *Sekhar*. The district court denied the motion to dismiss as to those two types of property.

---

[5] As discussed later in the opinion, certain of the racketeering predicate acts were based on violations of the New York Penal Law.

After the motion was granted in part and denied in part, only the following two types of property remained charged in the indictment:

- "Property of construction contractors consisting of wages and benefits to be paid pursuant to labor contracts with Local 17 at construction projects in Western New York."
- "Property of construction contractors consisting of wages and employee benefit contributions paid or to be paid by said contractors for unwanted, unnecessary, and superfluous labor."

Kirsch's App. 373.

The New York state extortion predicate racketeering acts in Count 1 (identified as Racketeering Acts 4B and 5B) defined the property extorted in the first of these ways; Racketeering Acts 4A and 5A of Count 1, and Count 2 (Hobbs Act conspiracy) defined the property in the second manner.

Kirsch and four of his codefendants proceeded to trial. The codefendants were acquitted of all charges. Kirsch, however, was convicted of racketeering conspiracy (Count 1) and Hobbs Act

13

conspiracy (Count 2).[6] With respect to Count 1, the jury found that Kirsch committed Racketeering Act 4, subparts A and B—attempted extortion of OSC in violation of the Hobbs Act and New York Penal Law, respectively—and Racketeering Act 5, subparts A and B— attempted extortion of Earth Tech in violation of the Hobbs Act and New York Penal Law, respectively.

After the verdict, Kirsch moved for a judgment of acquittal (or a new trial) on all the counts of which he was convicted. With respect to Racketeering Acts 4A and 5A (based on Hobbs Act extortion) of Count 1 (racketeering conspiracy) and Count 2 (Hobbs Act extortion conspiracy), Kirsch argued that the Government had not presented sufficient evidence that he had attempted to extort "wages and benefits to be paid . . . for unwanted, unnecessary, and superfluous

---

[6] Kirsch was also convicted under Count 5 (attempted Hobbs Act extortion of OSC), and Count 6 (attempted Hobbs Act extortion of Earth Tech), but was acquitted of the remaining charges. The district court set aside the convictions on Counts 5 and 6 after the verdict, and those counts are not subjects of this appeal.

14

labor." Kirsch's App. 435. Unlike in his motion to dismiss, he did not argue that *Enmons* shielded his conduct; rather, he argued that the Government *chose* to define the property related to the Hobbs Act violations as "wages and benefits to be paid . . . for unwanted, unnecessary, and superfluous labor," and had not proven attempted extortion of such property.[7] Kirsch's argument was that Local 17's goal had been to replace non-union laborers with Local 17 laborers who would perform actual and necessary work, and that the labor therefore would not be "superfluous." The district court agreed with this argument as applied to Racketeering Acts 4A and 5A of Count 1, and entered a judgment of acquittal with respect to those Hobbs Act-based racketeering acts.[8] But as to Racketeering Acts 4B and 5B of Count 1, which alleged predicate act violations of New York extortion statutes, the district court denied the motion for judgment of

---

[7] It would appear that the Government chose this language in an attempt to ensure compliance with *Enmons*.

[8] The Government does not cross-appeal from this ruling.

15

acquittal. For those racketeering acts, the Government defined the property not as "superfluous" labor, but rather as "wages and benefits to be paid pursuant to labor contracts with Local 17." Kirsch's App. 373. The district court concluded that the Government proved that Kirsch attempted to extort such wages and benefits. As to Count 2 (Hobbs Act extortion conspiracy), the district court concluded that the Amstar incident constituted an attempt to extort wages for labor that would have been superfluous—as the indictment charged—and denied the motion with respect to that count.

After the district court's decision on the post-trial motions, but before Kirsch's sentencing, the Supreme Court issued its decision in *Elonis v. United States*, 135 S. Ct. 2001 (2015). Kirsch filed a motion for a new trial based on *Elonis*, arguing that the district court's instructions regarding threats, which focused on the perception of the recipient rather than the intent of the maker of the threats, were improper under *Elonis*. The district court denied that motion.

16

Kirsch was sentenced to 36 months' imprisonment on Count 1, and 36 months' imprisonment on Count 2, with the sentences to run concurrently, followed by two years of supervised release. He was also ordered to pay a total of $198,121.50 in restitution to OSC and Amstar.

**DISCUSSION**

**I. NO *ENMONS*-LIKE EXCEPTION EXISTS UNDER NEW YORK PENAL LAW**

As to Count 1, following the district court's decision on the post-trial motions, only the two predicate acts based on New York Penal Law extortion violations remained to support a racketeering violation under the Racketeer Influenced and Corrupt Organizations Act ("RICO"). RICO provides that "[i]t shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of,

17

any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1962(a). Racketeering under 18 U.S.C. § 1962 requires a "pattern of racketeering activity," *id.* § 1962(a), which requires the Government to prove at least two acts of racketeering activity committed within ten years of one another, *id.* § 1961(5). Those acts are defined to include a number of criminal offenses under both state and federal law. *See id.* § 1961(1). As relevant here, "racketeering activity" includes Hobbs Act extortion, as well as "any act or threat involving . . . extortion . . . chargeable under State law and punishable by imprisonment for more than one year." *Id.* § 1961(1)(A)–(B). Kirsch argues that an *Enmons*-like exception exists under New York Penal Law and that as a result he could not be convicted of extortion based on those predicate acts because his conduct was committed in pursuit of a lawful union

18

objective. He challenges the denial of his pre-trial motion to dismiss on this ground.[9]

We review *de novo* the denial of a motion to dismiss the indictment. *United States v. Yannotti*, 541 F.3d 112, 121 (2d Cir. 2008).

We hold that no *Enmons*-like exception applies to the extortion provisions of the New York Penal Law. But before we examine the current New York statutes (i.e., those in effect at the time of the trial), we discuss *Enmons* and its interpretation of the Hobbs Act.

---

[9] As we explain further later in the opinion, in order for conduct to serve as a state law RICO extortion predicate act, it must (1) violate a state extortion statute and (2) satisfy the "generic" definition of extortion. *See Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003). Kirsch argued before the district court both that an *Enmons*-like exception exists under New York Penal Law and that an *Enmons*-like exception exists with respect to the "generic" definition of extortion. Succeeding on either argument would require that his conviction be reversed. However, on appeal, he argues only that an *Enmons*-like exception exists under New York Penal Law extortion, and does not reference the "generic" definition of extortion in the context of his *Enmons* argument. We therefore deem any argument related to the applicability of *Enmons* to the "generic" definition of extortion abandoned. *See United States v. Chen*, 378 F.3d 151, 162 n.7 (2d Cir. 2004) ("[T]he court does not ordinarily consider issues not adequately raised in an opening brief."); *LoSacco v. City of Middletown*, 71 F.3d 88, 92–93 (2d Cir. 1995) (explaining that arguments not raised in an appellate brief are abandoned).

The Hobbs Act prohibits robbery or extortion—including conspiracy and attempt—that affects interstate commerce. 18 U.S.C. § 1951(a). The Hobbs Act defines extortion as "the obtaining of property from another, with his consent, induced by *wrongful* use of actual or threatened force, violence, or fear." *Id.* § 1951(b)(2) (emphasis added).

In *United States v. Enmons*, the Supreme Court concluded that the use of "wrongful" in the Hobbs Act meant that the Hobbs Act could apply only to threats and violence used to obtain an objective that is itself unlawful, thus limiting the scope of Hobbs Act extortion liability in labor disputes. 410 U.S. at 400. In *Enmons*, union employees destroyed equipment belonging to their employer, a utility company, in an effort to obtain a new collective bargaining agreement. *Id.* at 397–98.

The *Enmons* Court held that this conduct did not violate the Hobbs Act, as the Act "does not apply to the use of force to achieve

20

legitimate labor ends," such as "higher wages in return for genuine services." *Id.* at 400–01. Accordingly, the Hobbs Act is not violated unless threats or force are used to obtain an illegitimate objective in a labor dispute, such as personal payoffs or "no-show" jobs.[10] *Id.* at 400.

In reaching that conclusion, the *Enmons* Court relied on both the language of the statute and the legislative history of the Hobbs Act. With respect to the language of the statute, the Court reasoned that "'wrongful' has meaning in the [Hobbs] Act only if it limits the statute's coverage to those instances where the obtaining of the property would itself be 'wrongful' because the alleged extortionist has no lawful claim to that property." *Id.* Indeed, "it would be redundant to speak of 'wrongful violence' or 'wrongful force' since . . . any violence or force to obtain property is 'wrongful.'" *Id.* at 399–400.

---

[10] We refer to this interpretation of the Hobbs Act by the Supreme Court as the "*Enmons* exception."

21

As to the legislative history, the Court concluded that Congress enacted the Hobbs Act in response to the Court's decision in *United States v. Local 807*, 315 U.S. 521 (1942). *Id.* at 401–02. As the *Enmons* Court explained, *Local 807* held that the predecessor to the Hobbs Act—the Anti-Racketeering Act of 1934, ch. 569, 48 Stat. 979 (amended by Hobbs Act, ch. 537, 60 Stat. 420 (1946))—did not prohibit the conduct of "members of a New York City truck drivers union who, by violence or threats, exacted payments for themselves from out-of-town truckers in return for the unwanted and superfluous service of driving out-of-town trucks to and from the city." *Enmons*, 410 F.3d at 402 (citing *Local 807*, 315 U.S. at 526). Congress enacted the Hobbs Act, the Court explained, to ensure that this type of conduct—extorting wages for "imposed, unwanted, and superfluous services"—was criminalized under the amended statute. *Id.* at 403. However, the Court also made clear that Congress did not intend the

Hobbs Act to reach extortion committed to achieve *legitimate* union objectives. *Id.* at 402–07.[11]

As described above, *Enmons* was based on the interpretation of the particular language of the Hobbs Act, as well as its legislative history. The question, then, is whether that interpretation informs our reading of the New York extortion statute, and whether a similar exception exists under that statute. Under the New York Penal Law prior to 1965, section 850 defined the offense of extortion in a manner similar to the Hobbs Act. Specifically, section 850 provided that "[e]xtortion is the obtaining of property from another . . . with [the victim's] consent, induced by a *wrongful* use of force or fear." N.Y. Penal Law § 850 (1909 (emphasis added). That definition closely tracked the language of the Hobbs Act by including the use of the

---

[11] Comments by legislators regarding the Hobbs Act emphasized that the Act was not intended to "interfere in any way with any legitimate labor objective or activity," *id.* at 404 (citation omitted), and Congressman Hobbs, the bill's sponsor, "explicitly refuted the suggestion that strike violence to achieve a union's legitimate objectives was encompassed by the Act," *id.* at 404–05.

word "wrongful." Accordingly, were that statute still in force today, the *Enmons* Court's observation that "it would be redundant to speak of 'wrongful violence' or 'wrongful force' since . . . any violence or force to obtain property is 'wrongful,'" *Enmons*, 410 U.S. at 400–01, would also guide us in our interpretation of that version of the New York Penal Law extortion statute. [12]

---

[12] The Supreme Court noted that the legislative history of the Hobbs Act indicated that Congress intended that the Act "d[o] no more than incorporate New York's conventional definition of extortion—'the obtaining of property from another . . . with his consent, induced by a wrongful use of force or fear . . . .'" *Enmons*, 410 U.S. at 406 n.16 (citation omitted). Referring to the pre-1965 version of the New York extortion statute and citing only New York cases decided prior to 1965, the Supreme Court stated that "[j]udicial construction of the New York statute reinforces the conclusion that, however militant, union activities to obtain higher wages do not constitute extortion." *Id*. Even though *Enmons* was decided in 1973, it is clear that the Supreme Court was referring to the "[j]udicial construction" of the pre-1965 extortion statute, which contained nearly identical language to the Hobbs Act, and was not considering the version in effect when *Enmons* was decided and still in effect today. Indeed, the Supreme Court was simply indicating that New York courts had interpreted the "conventional definition of extortion" to *not* include union violence "to obtain higher wages" at the time Congress passed the Hobbs Act, and that in adopting this "conventional definition," Congress likely intended the same result. *Id.* However, as we have explained, New York has abandoned the "conventional definition of extortion" in favor of the definition currently in effect.

24

In 1965, however, the New York extortion statute was amended. That amendment—which remains in effect today—reformulated the definition of extortion and removed the word "wrongful." *See* N.Y. Penal Law §§ 155.05, 155.40 (McKinney 1967). Under the current New York Penal Law,

> [a] person is guilty of . . . larceny . . . when he steals property and . . . 2. the property . . . is obtained by extortion committed by instilling in the victim a fear that the actor or another person will (a) cause physical injury to some person in the future, or (b) cause damage to property . . . .

N.Y. Penal Law § 155.40.[13]

The statute also explains that "[a] person obtains property by extortion when he compels or induces another person to deliver such property to himself or to a third person by means of instilling in him a fear that, if the property is not so delivered, the actor or another will," in relevant part:

---

[13] Extortion is a type of Grand Larceny in the Second Degree, a class C felony. N.Y. Penal Law § 155.40.

(i) Cause physical injury to some person in the future; or

(ii) Cause damage to property; or

. . . .

(vi) Cause a strike, boycott or other collective labor group action injurious to some person's business; except that such a threat shall not be deemed extortion when the property is demanded or received for the benefit of the group in whose interest the actor purports to act . . . .

N.Y. Penal Law § 155.05(2)(e).

New York's amended definition of extortion thus eliminates the word "wrongful," but also provides a separate exception for certain union activities. We address the implication of each of those changes below.

First, the elimination of "wrongful" renders the Supreme Court's statutory interpretation analysis in *Enmons* irrelevant to interpreting the current New York extortion statute. The Supreme Court's *Enmons* analysis relied on the presence of that word in the Hobbs Act, and its absence in the New York statute suggests that New York has not incorporated the Supreme Court's exception for labor activities into its own current law. Moreover, in contrast to the

26

legislative history of the Hobbs Act, the legislative history of the 1965 amendment to the New York Penal Law extortion statute does not indicate an intent to exempt the use of threats of force by members of a labor union to achieve a legitimate union objective from the prohibitions of the statute.[14]  Accordingly, *Enmons* does not guide us in interpreting the current version of the New York Penal Law extortion statute.

We therefore turn to the language of New York's revised definition of extortion and its exemption for certain union activities. The plain language of the current New York extortion statute prohibits threats of violence, even in labor disputes.  Section 155.05(e) of the New York Penal Law broadly prohibits "instilling [in the victim] a fear that" if the victim does not deliver the property, the actor will, as relevant here, injure a person or damage property.  For

---

[14] *See generally* Legislative History compiled by the New York Legislative Service, Inc., 1965, Ch. 1030.

27

example, subsection (e)(i) prohibits "instilling [in the victim] a fear" of personal harm, and subsection (e)(ii) prohibits "instilling [in the victim] a fear" of property damage.

Subsection 155.05(e)(vi) of the New York statute also prohibits extortion carried out by "instilling [in the victim] a fear" of "strike, boycott or other collective labor group action injurious to some person's business," but provides limited circumstances under which such conduct does not constitute extortion, namely "when the property is demanded or received for the benefit of the group in whose interest the actor purports to act." That exception to extortion liability does not, however, create an *Enmons*-like exception applicable to the New York extortion statute as a whole. The exception is contained only within subsection (vi), and thus it does not shield union members who violate other subsections of the statute—such as by threatening to commit violent acts against persons or property in violation of subsections (e)(i) and (ii)—from

28

extortion liability. Rather, it protects only union members who threaten to perform *certain* union activities taken to benefit a labor group.

In addition, and unlike the Hobbs Act, the protected activity is clearly defined and cannot be read to encompass threats to cause personal injury or damage property. As we have noted, the statute lists "strike[s], boycott[s] or other collective labor group action[s]" as permissible threats only where "the property is demanded or received for the benefit of the group in whose interest the actor purports to act." N.Y. Penal Law § 155.05(e)(vi). The only basis to argue that the statute permits threats to cause property damage or personal injury in the labor dispute context is the language authorizing threats for "other collective labor group action" undertaken to benefit a labor group. But the context here demonstrates that "other collective labor group action" does not include such threats. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 341

29

(1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").  Rather, the terms that precede "other collective labor group action"—"strike" and "boycott"—demonstrate that the term can only be understood as permitting threats to undertake traditional union organizing and collective action activities.  As the Supreme Court has explained, a "word is known by the company it keeps," and here, that principle compels an interpretation that maintains the New York Penal Law's categorical prohibition against extortion that threatens personal injury or property damage.  *See also United States v. Williams*, 553 U.S. 285, 294 (2008) ("[A] word is given more precise content by the neighboring words with which it is associated.").  As a result, New York's extortion statute does not shield Kirsch from criminal liability.

Here, the Government presented sufficient evidence to the jury that Kirsch "instill[ed] in the [victims] a fear" that Local 17 would cause personal injury in violation of subsection (e)(i), and cause property damage in violation of subsection (e)(ii), in connection with the OSC and Earth Tech episodes. Accordingly, Kirsch's challenge to the sufficiency of Predicate Acts 4B and 5B of Count 1 under subsections (e)(i) and (ii) of New York Penal Law § 155.05 fails.

**II.  THE PROPERTY SET FORTH IN RACKETEERING ACTS 4B AND 5B WAS "TRANSFERABLE"**

As discussed above, the Count 1 racketeering conspiracy conviction was predicated upon New York state law predicate acts of extortion. Violations of state extortion statutes *may* qualify as RICO predicate acts, but only if such violations are also "'capable of being generically classified as extortionate.'" *Wilkie v. Robbins*, 551 U.S. 537, 567 (2007) (quoting *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 409 (2003)). "[S]uch 'generic' extortion is defined as 'obtaining something of value from another with his consent induced by the

31

wrongful use of force, fear, or threats.'" *Scheidler*, 537 U.S. at 409 (quoting *United States v. Nardello*, 393 U.S. 286, 290 (1969)). Thus, in order for conduct to serve as a state law RICO extortion predicate act, it must (1) violate a state statute and (2) satisfy that "generic" definition of extortion.

Relying on the Supreme Court's decision in *Sekhar v. United States*, 570 U.S. 729 (2013), Kirsch argues that the property that he was convicted of extorting was not transferable, and that the district court should have granted pre-trial dismissal of Counts 1 and 2 on that basis. Because we later conclude that the district court should have granted a judgment of acquittal with respect to Count 2 based upon insufficiency of the evidence, we need not reach Kirsch's argument that *Sekhar* provides a basis to set aside his conviction under Count 2. Accordingly, we address only whether the reasoning of *Sekhar* requires us to vacate his conviction under Count 1 for racketeering conspiracy based on New York Penal Law extortion predicate acts.

In contrast to Kirsch's *Enmons*-based challenge to his Count 1 conviction, his *Sekhar*-based challenge to Count 1 addresses both the New York Penal Law definition of extortion as well as the "generic" definition applicable to all state law RICO extortion predicate acts. *See* Kirsch Reply Br. at 19 ("In order to serve as predicate racketeering acts for a federal RICO charge, . . . state law offenses must be capable of being generically classified as extortionate."). Accordingly, we address (1) whether *Sekhar*—a decision interpreting the Hobbs Act— also applies to the "generic" definition of extortion, and if it does (2) whether the property that Kirsch was convicted of extorting in Racketeering Acts 4B and 5B satisfies *Sekhar*.[15] We conclude that

---

[15] We need not separately address whether the property Kirsch extorted qualified as "property" under the New York Penal Law extortion statute. Kirsch's only property-based challenge to the New York Penal Law component of his Count 1 conviction is that a *Sekhar*-like "transferability" requirement also exists under New York Penal Law, and is not satisfied. Stated otherwise, Kirsch does not argue that the property he was convicted of extorting fails to qualify as "property" under New York law for some other reason. While we note that transferability does not appear to be a requirement under New York Penal law, *see People v. Garland*, 69 N.Y.2d 144, 147 (1987) ("[A]n interest need not be transferable to constitute 'property' under [New York] Penal Law § 155.00(1)."), we need not directly

33

*Sekhar* applies to the "generic" definition of extortion, but that the transferability of property requirement of *Sekhar* is satisfied with respect to the state law predicate acts.

The "generic" definition of extortion applicable to RICO state law extortion predicate acts and the Hobbs Act definition of extortion are nearly identical. *Compare Scheidler*, 537 U.S. at 409 ("'[G]eneric' extortion is defined as obtaining something of value from another with his consent induced by the wrongful use of force, fear, or threats." (internal quotation marks omitted)), *with* 18 U.S.C. § 1951(b)(2) (defining extortion as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"). That both definitions include the word "obtaining" is particularly relevant to our analysis.

---

address the issue, for we conclude below that the property at issue here was "transferable."

In *Scheidler*, the Supreme Court, pointing to "obtaining" in the Hobbs Act definition of extortion, the history of the Act, and the common law crime of extortion, held that the Hobbs Act requires "that a person must 'obtain' property from another party to commit extortion." 537 U.S. at 404. The Court held that the generic "state extortion offense for purposes of RICO" also "require[s] a party to obtain or to seek to obtain property." *Id.* at 410.

Subsequently, in *Sekhar*, the Supreme Court further explained that "[o]btaining property requires 'not only the deprivation but also the acquisition of property.'" *Sekhar*, 570 U.S. at 734 (quoting *Scheidler*, 537 U.S. at 404). As a result, extortion "requires that the victim part with his property, and that the extortionist gain possession of it." *Id.* (internal quotation marks and citation omitted). Thus, to summarize, "property extorted must . . . be *transferable*—that is, capable of passing from one person to another." *Id.*

*Sekhar* addressed only the Hobbs Act definition of extortion, not the "generic" definition of extortion for the purpose of analyzing state law RICO predicate acts. However, since *Sekhar*'s holding requiring transferability is a clarification of what it means to "obtain" property, *see id.* at 736 ("*Scheidler* rested its decision, as we do, on the term 'obtaining.'"), and the "generic" definition of extortion requires that property be obtained, *see Scheidler*, 537 U.S. at 410, we conclude that the requirement of transferability applies with equal force to "generic" state law RICO predicate extortion offenses. Accordingly, in order for a state extortion offense to serve as a RICO predicate act, the property extorted must be "transferable—that is, capable of passing from one person to another." *Sekhar*, 570 U.S. at 734 (emphasis omitted).

We next address whether the property that Kirsch was convicted of extorting under New York Penal Law in Racketeering Acts 4B and 5B—namely, "[p]roperty of construction contractors

consisting of wages and benefits to be paid pursuant to labor contracts with Local 17 at construction projects in Western New York,"—is transferable. Kirsch's App. 373. We conclude that it is.

In *Scheidler*, anti-abortion activists attempted to close abortion clinics by interfering with doctors, nurses, clinic staff, and women seeking access to the clinics. 537 U.S. at 400–01. The National Organization of Women and two clinics brought a civil RICO action against the anti-abortion activists, alleging a pattern of extortionate racketeering acts under the Hobbs Act and state law. *Id.* at 398. The Court characterized the property the defendants allegedly extorted as the "right to seek medical services from the clinics, the clinic doctors' rights to perform their jobs, and the clinics' rights to provide medical services and otherwise conduct their business." *Id.* at 399. In holding that such conduct was not extortionate, the Court stated that "even when [the] acts of interference and disruption achieved their ultimate goal of 'shutting down' a clinic that performed abortions, such acts

37

did not constitute extortion because [the defendants] did not 'obtain' [plaintiffs'] property." *Id.* at 404–05. While "[the defendants] may have deprived or sought to deprive [the plaintiffs] of their alleged property right of exclusive control of their business assets, . . . they did not acquire any such property." *Id.* at 405. The Court observed that characterizing this type of behavior as extortion would "discard the statutory requirement that property must be obtained from another, replacing it instead with the notion that merely interfering with or depriving someone of property is sufficient to constitute extortion." *Id.*

The Court reached a similar conclusion in *Sekhar*. In that case, the defendant was convicted of Hobbs Act extortion for attempting to force the general counsel for the New York State Comptroller to recommend investing in a fund managed by the defendant's company by threatening to expose the general counsel's alleged extramarital affair. 570 U.S. at 731. The Court characterized the

38

property right as "the general counsel's intangible property right to give his disinterested legal opinion . . . free of improper outside interference." *Id.* at 737–38 (internal quotation marks omitted). The Court concluded that while the defendant could deprive the general counsel of this right, he could not possibly have "obtained" it for himself. *See id.* Accordingly, the property was not transferable, and the defendant's Hobbs Act attempted extortion conviction was reversed. *See id.*

In both *Scheidler* and *Sekhar*, the conduct did not constitute extortion because the defendants could not obtain the property for themselves; rather, they could merely "interfere" with the victims' use of it. Such conduct perhaps constituted the New York offense of coercion, but not extortion. *See Scheidler*, 537 U.S. at 404–08; *Sekhar*, 570 U.S. at 734–35; *see also* N.Y. Penal Law § 135.60 ("A person is guilty of coercion . . . when he or she compels or induces a person to engage

in conduct which the latter has a legal right to abstain from engaging in . . . .").[16]

In contrast, Kirsch sought to extort property that Local 17 members could clearly "obtain": wages and benefits from construction contractors. Wages and benefits are "capable of passing from one person to another,"—in this case, from the employer to the

---

[16] In discussing the New York crime of coercion, the *Sekhar* Court stated that "[a]t the time [Congress enacted the Hobbs Act], New York courts had consistently held that the sort of interference with rights that occurred [in *Sekhar*] was coercion." 570 U.S. at 735 (emphasis omitted). In support, the Court included, *inter alia*, the following citation: "*People v. Scotti*, 266 N.Y. 480, 195 N.E. 162 (1934) (compelling victim to enter into agreement with union)." Based on that citation, Kirsch argues that his conduct constituted only the offense of coercion, not extortion. But neither *Scotti* nor the Supreme Court's citation to it can bear the weight Kirsch assigns to them. First, the property charged in Racketeering Acts 4B and 5B is "wages and benefits," not a union agreement. Second, *Scotti*, a summary disposition of an appeal of four defendants' coercion convictions, conveys only that the defendants were convicted of using "threats and force [to] compel[] the complainant, a manufacturer, to enter into an agreement with a labor union of which the defendants were members," and that there was insufficient evidence to support the convictions of three of those defendants. *Scotti*, 266 N.Y. at 480. Accordingly, we do not know the type of agreement sought, and whether it would have qualified as "obtainable" or "transferable" property. We therefore decline to read *Sekhar*'s citation to *Scotti* as creating a broad rule that *any* type of agreement with a union is *per se* not property that may be extorted.

employee—and are therefore "transferable." *Sekhar*, 570 U.S. at 734. Indeed, when an employer pays wages and provides benefits to an employee, the employer "part[s] with" that property, and the employee "gain[s] possession" of it. *Id.* (citations omitted). Accordingly, Kirsch's conviction under Count 1 meets the requirement recognized in *Scheidler* and *Sekhar* that the targeted property be transferable.

## III. SUFFICIENCY OF THE EVIDENCE FOR COUNT 2

Kirsch argues that his conviction for Count 2—Hobbs Act extortion conspiracy—must be reversed because the Government presented insufficient evidence that Kirsch agreed with others to extort wages for "unwanted, unnecessary, and superfluous labor." Specifically, he contends that the Government failed to prove his involvement in the Amstar incident.

In granting in part and denying in part Kirsch's motion for judgment of acquittal, the district court ruled that only the Amstar

41

incident was evidence of an attempt to extort wages for "unwanted, unnecessary, and superfluous labor," and upheld the jury's Count 2 verdict on that basis.[17] The court rejected the Government's argument that Kirsch's conduct with respect to other contractors qualified as such. On appeal, the Government defends the Count 2 conviction with two arguments. First, the Government contends that it presented sufficient evidence with respect to the Amstar incident to support the Hobbs Act conspiracy conviction. Second, the Government argues that the actions of Kirsch and Local 17 towards OSC and EarthTech constitute an attempt to extort wages for

---

[17] Even assuming that the district court was correct that the Government presented sufficient evidence of Kirsch's involvement in the Amstar episode, its conclusion that a new trial was not warranted was incorrect. The district court decided that all of the non-Amstar evidence that the Government presented with respect to Count 2 did not prove a conspiracy to extort wages for "unwanted, unnecessary, and superfluous labor." The jury rendered only a general guilty verdict for Count 2. Accordingly, it is impossible to conclude that the jury relied on the Amstar incident in convicting Kirsch under Count 2. Rather, the jury's Count 2 verdict could have been based upon its belief that Kirsch committed unlawful conduct with respect to other contractors, conduct that the court later found did not qualify as attempts to extort wages for "unwanted, unnecessary, and superfluous labor."

"unwanted, unnecessary, and superfluous labor" because Local 17 workers were not qualified to do the work at those job sites and therefore could not have been substituted for the other workers.[18] Kirsch responds that the Government failed to prove that Local 17 workers lacked the requisite qualifications for the OSC and EarthTech work.

Before we more fully discuss the evidence the Government presented regarding Amstar, EarthTech, and OSC, we address the language of Count 2 of the indictment. Although the indictment curiously identifies 76 "overt acts in furtherance of Count 2," Kirsch's

---

[18] As explained above, the district court rejected the Government's argument that the conduct with respect to EarthTech and OSC constituted attempts to extort wages for "unwanted, unnecessary, and superfluous labor" and accordingly granted judgment of acquittal with respect to Racketeering Acts 4A and 5A, and Counts 5 and 6 (all involving EarthTech and OSC). The Government does not cross-appeal from the judgment of acquittal, but challenges the district court's reasoning. But because the Government does not challenge the district court's reasoning "with a view either to enlarging [its] own rights thereunder or of lessening the rights of [its] adversary," *Jennings v. Stephens*, 135 S. Ct. 793, 798 (2015) (quotation marks omitted), its failure to cross-appeal does not foreclose it from disputing the correctness of the district court's conclusion as to the Earth Tech and OSC incidents in arguing on appeal that Kirsch's conviction under Count 2 should be affirmed.

App. 394–411, proof of an overt act is not necessary to sustain a conviction for Hobbs Act conspiracy, *see United States v. Gotti*, 459 F.3d 296, 338 (2d Cir. 2006). However, that does not relieve the Government of its burden to prove the existence of the conspiracy charged in the indictment—in this case a conspiracy to extort wages for "unwanted, unnecessary, and superfluous" labor. *See In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 93, 113 (2d Cir. 2008) ("To establish the existence of a criminal conspiracy, the government must prove that the conspirators agreed on the essence of the underlying illegal objective[s], and the kind of criminal conduct . . . in fact contemplated." (alterations in original) (internal quotation marks omitted)). The 76 "overt acts" are therefore properly viewed as incidents allegedly supporting Kirsch's membership in a Hobbs Act extortion conspiracy, not as overt acts that the Government was required to prove to sustain a conviction. Also, while the 76 "overt acts" are listed in the indictment, on appeal the Government has

44

identified only those involving Earth Tech, OSC, and Amstar as providing evidentiary support for the conviction under Count 2.

We review the denial of a motion for a judgment of acquittal *de novo*. *United States v. Reyes*, 302 F.3d 48, 52–53 (2d Cir. 2002). To prevail on a motion for judgment of acquittal, the defendant must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. McDermott*, 245 F.3d 133, 137 (2d Cir. 2001) (internal quotation marks omitted). In evaluating whether a defendant has met this burden, "we consider all of the evidence, both direct and circumstantial, in the light most favorable to the government, crediting every inference that the jury might have drawn in favor of the government." *United States v. Velasquez*, 271 F.3d 364, 370 (2d Cir. 2001) (internal quotation marks omitted).

We first address whether sufficient evidence connected Kirsch to the Amstar incident to support a Hobbs Act conspiracy conviction.

Applying the Norris-LaGuardia Act ("NLGA"), we conclude that it does not. The NLGA limits the liability of union officers and members for the conduct of their fellow union members. 29 U.S.C. § 106. It provides that

> [n]o officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof.

*Id.* The Hobbs Act specifically incorporates the limitations set forth in the NLGA. 18 U.S.C. § 1951(c) ("This section shall not be construed to repeal, modify or affect . . . sections . . . 101–115 of Title 29 . . . .").

In *United Brotherhood of Carpenters v. United States*, the Supreme Court held that the NLGA precludes liability of a union member for the unlawful conduct of a fellow union member "except upon clear proof that the particular act charged, or acts generally of that type and quality, had been expressly authorized, or necessarily followed from

46

a granted authority, by the [union] or non-participating member sought to be charged or was subsequently ratified by such [union] . . . or member after actual knowledge of its occurrence." 330 U.S. 395, 406–07 (1947). The Court added that "the custom or traditional practice of a particular union can . . . be a source of actual authorization of an officer to act for and bind the union." *Id.* at 410.

As a result, in order for the Amstar incident to support Kirsch's conviction on Count 2, the Government would have had to present evidence that Kirsch participated in, "expressly authorized," or "subsequently ratified" attempts to extort wages for "unwanted, unnecessary, and superfluous labor"—i.e., not replacement labor—or was responsible for "a custom or traditional practice" of extorting wages for such labor. It did not.

The evidence presented to the jury that Perkins, the Local 17 member who contacted Amstar about its compressor, was responsible for the destruction at the Amstar job site was scant.

Additionally, the evidentiary link between Kirsch and that destruction was absent. There was no testimony that Kirsch was personally involved in the Amstar incident, directed unlawful conduct towards Amstar, or ratified it after it occurred. Accordingly, in order for Kirsch to be liable under the NLGA with respect to the Amstar incident, there would have to be evidence that (1) Kirsch was at least responsible for "a custom or traditional practice" of seeking such fictitious work that caused Perkins to make the request for the union employment that he made to Lignos of Amstar, and that (2) the "custom or traditional practice" resulted in cutting the fuel line. *See United Bhd. of Carpenters*, 330 U.S. at 410. The evidence presented to the jury did not support such a connection.

There was evidence that Kirsch referred to his general strategy for Local 17 as "turn or burn." Gov't App. 217–18. The "turn" part of that phrase refers to convincing contractors to sign collective bargaining agreements with Local 17 and to hire Local 17 workers.

48

The "burn" refers to picketing at worksites and even vandalizing equipment if contractors refused Local 17's requests. As one Local 17 member testified, "turn or burn" indicated that contractors "would either become union or we would put them out of business." Gov't App. 417. However, that general strategy is insufficient to connect Kirsch to the particular threat and destruction of the Amstar property, and as we have stated, no other evidence connects Kirsch to the Amstar incident. Accordingly, no reasonable jury could find beyond a reasonable doubt that Kirsch was responsible for the Amstar incident.

Next, we turn to the Government's argument that Kirsch's conduct with respect to OSC and EarthTech constituted evidence of attempts to extort wages for "unwanted, unnecessary, and superfluous labor."

The Government argues that the employees at Earth Tech and OSC were "uniquely trained and qualified" to do the work that

49

needed to be done at those sites—specifically "excavating contaminated earth, getting that earth safely into specially outfitted trucks, and then getting it to landfills quickly and with no spillage"— and that workers from Local 17 were unqualified to do such work. Gov't's Br. at 41. Indeed, if Local 17 workers were not qualified and able to do the work they sought, the wages they would be paid would be for "superfluous" labor. However, the evidence did not establish that Local 17 members did not meet—or that it would be particularly difficult for them to meet—the OSC and Earth Tech job site requirements.

James Minter, a former Local 17 member and former Kirsch co-defendant, and a Government cooperating witness, testified that Local 17 members completed a 40-hour Occupational Safety and Health Administration training on handling hazardous materials as part of their apprenticeship program. Similarly, Kirsch's co-defendant Thomas Freedenberg testified that Local 17 members

received the "training necessary to work on hazardous waste jobs, jobs where you have contaminated material and it needs to go to a disposal site." Tr. 4057–58.

There was no testimony regarding whether Local 17 members' hazardous materials training specifically qualified them to work with the contaminated soil at the two particular sites. However, testimony regarding the Earth Tech and OSC job sites did not show that Local 17 workers were unqualified to perform such general soil remediation work.

With respect to Earth Tech, William Lindheimer, the project manager for Earth Tech at the Buffalo site, testified regarding the qualifications necessary to work at that site:

> First of all, there's a lot of prequalifications that go into the employees that we have to hire. Our operators and laborers, they have to go through a pretty extensive physical process. They have to be first qualified. They have to have some proper training and certificates. They have to be suitable for the work. They have to wear respiratory protection. They have to be capable of performing their tasks in respirators. In addition, the

kind of the prequalifications they, also—you know, we spend a great deal of time with our operators with our own what we would call standard operating procedures, how we like to excavate the soil, how we like to load that soil into the trucks, how we like to move the material on our particular job sites.

Gov't App. 290–91.

No further details were provided regarding how much effort it would have taken to train Local 17 workers on Earth Tech's "standard operating procedures." Furthermore, Lindheimer testified that he was unaware whether Local 17 employees had the requisite training and certificates to work on the Earth Tech job site. Kirsch Reply Br. App. 39–40. Thus, the Government failed to prove that Local 17 members were unqualified to work at the Earth Tech site, or that training them on the particular procedures of Earth Tech would have been so extensive as to preclude hiring them.

Regarding the qualifications needed to work at the OSC job site, Jon Williams, the founder of OSC, testified that

[I]ndividuals that are on these job sites have to have a certain level of training that's mandated by the federal government, and in some cases, New York State Department of Labor. And most of that training is just to make sure that the employee has knowledge, understanding, and awareness of the contaminants.

Gov't App. 20. Like with Earth Tech, there was no testimony indicating how much of such training was required. More importantly, the Government provided no evidence that Local 17 workers were not already qualified to do the work at OSC's site.[19]

The trial record establishes that Local 17 members would have likely qualified for the work on the Earth Tech and OSC projects. Even if there were some particular steps needed to qualify for such work, those were minimal, and certainly would not make the Local 17 members' employment by those two companies "unwanted, unnecessary, and superfluous." Accordingly, we conclude that the Government presented insufficient evidence at trial of Kirsch's

---

[19] On cross-examination, Williams testified that, like Lindhemer on the Earth Tech project, he did not know whether Local 17 members received the requisite training to do the work at OSC's job site.

53

involvement in a conspiracy to extort wages for "unwanted, unnecessary, and superfluous" labor to support his conviction under Count 2, and that therefore a judgment of acquittal must be entered with respect to that count. [20]

**IV. THE JURY WAS PROPERLY INSTRUCTED WITH RESPECT TO THREATS UNDER NEW YORK PENAL LAW EXTORTION**

---

[20] The Government also argues that *United States v. Robilotto*, 828 F.2d 940 (2d Cir. 1987), requires us to hold that Kirsch's conduct with respect to OSC and EarthTech constituted an attempt to extort wages for "unwanted, unnecessary, and superfluous labor." In *Robilotto*, a local union forced an employer to pay wages to a local union worker for a job already being performed by an out-of-state union member. *Id.* at 943. Because the employer had to "hire two workers for the same job," and "the work [was] performed . . . by the employee from [out-of-state]," *id.*, the Court concluded that "[i]t would be difficult to imagine a more obvious instance of imposed, unwanted, superfluous and fictitious labor services," *id.* at 945. The Government argues that *Robilotto* controls here because "it was the employer's determination to capitulate to the union's demand that put him in the position of now paying for two employees to do the work of one" that distinguishes the situation here from *Robilotto*, and that this is a distinction without legal significance. Gov't Br. at 40. It appears to be the Government's position that if Kirsch's threats succeeded, the contractors would have had to pay wages to both the non-union workers and the Local 17 workers who replaced them. If this were true, *Robilotto* would be relevant. However, the Government cites no evidence that the contractors would have continued to pay the non-union workers after replacing them with Local 17 workers, as opposed to terminating the non-union workers.

Finally, Kirsch argues that the district court improperly instructed the jury with respect to the mens rea required for the extortion threats, and that his racketeering conspiracy conviction (Count 1) and Hobbs Act conspiracy conviction (Count 2) must therefore be vacated. "We review a claim of error in jury instructions *de novo*, reversing only where, viewing the charge as a whole, there was a prejudicial error." *United States v. Aina-Marshall*, 336 F.3d 167, 170 (2d Cir. 2003). Since we have already held that Kirsch's conviction for Count 2 must be vacated, we need only address his argument that the court's instructions with respect to Count 1, specifically Racketeering Acts 4B and 5B under New York law, were improper. We conclude that because the challenged instruction was given only with respect to Hobbs Act extortion, and that the court's instruction regarding New York Penal Law extortion complied with New York law, Kirsch is not entitled to a new trial on Count 1.

While instructing the jury on the elements of Hobbs Act extortion with respect to Counts 3 through 7, the district court stated that "[y]our decision whether a defendant used or threatened fear of injury involves a decision about the *victim's* state of mind at the time of the defendant's actions." Gov't App. 533 (emphasis added). Relying primarily upon *Elonis v. United States*, 135 S. Ct. 2001 (2015), Kirsch argues that that instruction was improper because it focused only on the victim's perception of the threat, rather than on the intent of the person who made the threat. In *Elonis*, the Court interpreted 18 U.S.C. § 875(c)—which criminalizes threats to injure a person when made in interstate commerce—to require that the Government prove that the defendant have the mental state of "transmit[ting] a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." 135 S. Ct. at 2012. The Court reversed Elonis's conviction because the jury was not so instructed. *Id.*

Neither the Supreme Court nor this court has decided whether *Elonis* extends beyond 18 U.S.C. § 875(c).[21] But even if it does and the district court's instructions were incorrect as to the Hobbs Act, any error with respect to the Hobbs Act extortion count instructions did not prejudicially affect the jury's verdict with respect to the New York Penal Law extortion racketeering predicate acts charged in Count 1, on which the jury was properly charged. *See Aina-Marshall*, 336 F.3d at 170 (We . . . revers[e] only where, viewing the charge as a whole, there was a prejudicial error.").

The New York extortion statute specifically proscribes "instilling in the victim . . . fear" in order to obtain property, N.Y. Penal Law § 155.40, thus appearing to focus the statute on the threat's

[21] Prior to *Elonis*, we stated that "[t]his Circuit's test for whether conduct amounts to a true threat 'is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury.'" *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (alteration in original) (quoting *United States v. Davilla*, 461 F.3d 298, 305 (2d Cir. 2006)). We need not address the effect, if any, of *Elonis* on Hobbs Act extortion because we need only consider the intent requirement under New York law.

effect on the recipient rather than the intent of its maker. Furthermore, in instructing the jury with respect to the New York Penal Law racketeering predicate acts, the district court recited the New York model jury charge for the offense of extortion. Kirsch does not argue that the court's instructions with respect to New York Penal Law extortion failed to accurately and adequately instruct the jury on the elements of that offense. Nor does he explain how the threat instruction given in connection with the Hobbs Act counts could have affected the instruction given on New York Penal Law extortion.

Accordingly, we find that there was no error with respect to the court's instructions on New York Penal Law extortion for Count 1, and that any possible error with respect to the required mens rea for Hobbs Act extortion did not result in prejudicial error as to the New York Penal Law extortion charge.

## V.    KIRSCH'S SENTENCE

Kirsch was sentenced to 36 months' imprisonment on Count 1, and 36 months' imprisonment on Count 2, with the sentences to run concurrent to one another.  Our decision vacates Count 2.  In order "to give the district court an opportunity to reevaluate the sentence[] in this changed light," we remand the matter to the district court for resentencing on Count 1.  *United States v. Petrov*, 747 F.2d 824, 832 (2d Cir. 1984) (remanding for resentencing after affirming only six of 11 counts with respect to which concurrent sentences were imposed).[22]

## CONCLUSION

For the foregoing reasons, we **AFFIRM** Kirsch's conviction under Count 1, **REVERSE** Kirsch's conviction under Count 2, and

---

[22] In a letter submitted on June 5, 2018, pursuant to Federal Rule of Appellate Procedure 28(j), Kirsch argues that the Supreme Court's decision in *Lagos v. United States*, 138 S. Ct. 1684 (2018), requires vacatur of the district court's restitution award.  Since we remand this case for resentencing, we leave it to the district court to address this argument in the first instance, including the Government's contention that Kirsch forfeited it.  On remand, the district court should also address the impact of our holding that Kirsch's involvement in the Amstar incident was not proved beyond a reasonable doubt on the restitution amount.

**REMAND** the case to the district for entry of judgment of acquittal with respect to Count 2, and for resentencing with respect to Count 1.