# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 52
The People &c.,
     Respondent,
       v.
Carlos Torres,
     Appellant.
-------------------------------------
No. 53
The People &c.,
     Respondent,
       v.
Dave Lewis,
     Appellant.

Case No. 52:
Katharine Skolnick, for appellant.
Samuel Z. Goldfine, for respondent.
City of New York, amicus curiae.

Case No. 53:
Nathaniel Z. Marmur, for appellant.
Amanda Katherine Regan, for respondent.
City of New York, amicus curiae.

GARCIA, J.:

In a fourteen-year period ending in 2013, New York City recorded more than 4,700 traffic-related fatalities. Many of the victims were pedestrians and bicyclists. In response, the City launched a "Vision Zero"[1] initiative in 2014 that included the enactment of

---

[1] "Vision Zero" is an approach to road safety, developed in Sweden, based upon the principle that it "can never be ethically acceptable that people are killed or seriously injured when moving within the road transport system" (Claes Tingvall & Narelle Haworth, *Vision*

Administrative Code of the City of New York § 19-190, known as the "Right of Way Law."

That law makes it a misdemeanor for a driver, while "fail[ing] to exercise due care," to

make "contact with" a pedestrian or bicyclist who has the "right of way" and thereby cause

"physical injury" (Administrative Code of City of NY § 19-190 [a]-[c]). Defendants, each

convicted of violating the Right of Way Law, claim that the statute is unconstitutional,

arguing that it violates due process by employing an "ordinary care" mens rea and is

preempted by state law. We reject those challenges and affirm in each case.

## I.

These appeals involve fatal accidents on Manhattan streets. In *Torres*, defendant,

driving a truck, made a right turn, striking and killing a pedestrian inside a crosswalk with

the "WALK" signal in her favor. In *Lewis*, defendant was at the wheel of a bus that struck

and ran over a bicyclist, causing the rider to suffer fatal injuries. Each defendant was

charged with violating the Right of Way Law, a misdemeanor, and Vehicle and Traffic

Law § 1146 (c) (1), a traffic infraction.[2]

Both defendants moved on similar grounds to dismiss the count charging a violation

of the Right of Way Law. Defendants asserted that the Right of Way Law's ordinary

negligence mens rea violates due process because the standard is both impermissibly vague

---

*Zero – An Ethical Approach to Safety and Mobility* [2000], *available at* https://www.monash.edu/muarc/archive/our-publications/papers/visionzero [last accessed Sept. 19, 2021]).

[2] Vehicle and Traffic Law § 1146 makes it a traffic infraction for a driver, while "failing to exercise due care," to collide with a pedestrian or bicyclist and cause either "physical injury" (Vehicle and Traffic Law § 1146 [b] [1]) or "serious physical injury" (*id.* § 1146 [c] [1]). Fines are enhanced in the case of serious physical injury (*id.* § 1146 [c] [1]), while recidivists face misdemeanor liability (*id.* § 1146 [d]).

and legally insufficient for imposing criminal liability.  Defendants also made two preemption arguments, asserting that the Right of Way Law impermissibly punishes more severely the same conduct proscribed by Vehicle and Traffic Law § 1146, and that the Right of Way Law's use of ordinary negligence as a culpable mental state is prohibited by article 15 of the Penal Law.  In each case, the court denied defendant's motion.

Torres, by plea, and Lewis, following a bench trial, were convicted of violating Vehicle and Traffic Law § 1146 (c) (1) and the Right of Way Law.  On appeal, both defendants reasserted their challenges to the latter statute's validity.  Adopting the same analysis in each case, the Appellate Term unanimously rejected those arguments and affirmed (*see People v Torres*, 65 Misc 3d 19, 22-23 [App Term, 1st Dept 2019]; *People v Lewis*, 2019 NY Slip Op 51711[U], *1 [App Term, 1st Dept 2019]).  With respect to the due process claim, the court held that, given that statutes imposing strict liability, "[p]articularly with regard to public welfare offenses," have passed muster, "there is no constitutional infirmity in an offense that requires proof of defendant's failure to exercise due care, a more culpable mental state" (*Torres*, 65 Misc 3d at 22).  The court next rejected the argument that the Right of Way Law is preempted by Vehicle and Traffic Law § 1146, applying the rule that a local law that "merely provides a greater penalty than state law does not run afoul of the conflict preemption doctrine" (*id.*).  Lastly, the court held that the list of culpable mental states found in article 15 of the Penal Law is inapplicable to offenses "defined outside the Penal Law" (*id.* at 23).

A Judge of this Court granted leave to appeal in each case.

## II.

Defendants raise the same constitutional arguments on appeal to this Court as were raised below: that the Right of Way Law violates due process and is preempted by state law.

A.

We consider first defendants' due process challenge, namely that the State and Federal Constitutions require more than ordinary negligence as a culpable mental state for imposing criminal liability, relying primarily on the Supreme Court's decision in *Elonis v United States* (575 US 723 [2015]).[3]

As an initial matter, the Supreme Court "has never articulated a general constitutional doctrine of mens rea" (*Powell v Texas*, 392 US 514, 535 [1968]; *see Copeland v Vance*, 893 F3d 101, 122 [2d Cir 2018] ["the Supreme Court has been at pains not to constitutionalize mens rea"], *cert denied* 139 S Ct 2714 [2019]). And even strict liability offenses, which require no culpable mental state, have been held by that Court to pass constitutional muster (*see e.g. United States v United States Gypsum Co.*, 438 US 422, 437 [1978] [explaining that "strict-liability offenses are not unknown to the criminal law and do not invariably offend constitutional requirements"]; *see also Smith v California*, 361 US 147, 150 [1959]).

Over the years, New York has codified a number of strict liability crimes (Penal Law §§ 15.10, 15.15 [2]; *see People v Byrne*, 77 NY2d 460, 463 [1991]). We have long recognized the constitutionality of such strict liability offenses (*see e.g. People v Persce*,

---

[3] Defendants make no independent argument under the State Constitution (*see People v Hansen*, 99 NY2d 339, 344, 345 n 4 [2003]).

204 NY 397, 402-403 [1912] [holding that a law, making possession of certain "dangerous and foul" weapons criminal "itself," was "no infringement of the Constitution"]).  Indeed, in recognizing the validity of "public welfare offenses" that do not require a showing of any mens rea, the Supreme Court cited a decision by this Court, rejecting the argument that an element of conscious wrongdoing, which is required in the prosecution of "infamous crimes," was also required to establish minor criminal violations of regulations governing tenement houses or child labor laws (*see Morissette v United States*, 342 US 246, 257-258 [1952], citing *People ex rel. Price v Sheffield Farms-Slawson-Decker Co.*, 225 NY 25, 32-33 [1918]; *Tenement House Dept. of City of N.Y. v McDevitt*, 215 NY 160, 168 [1915]).  Our legislature has also enacted laws outside the Penal Law that impose criminal liability based on ordinary negligence (*see e.g.* Vehicle and Traffic Law § 1146 [imposing criminal liability on a driver who, while failing to exercise due care, collides with a pedestrian or bicyclist and causes either physical injury or serious physical injury]; Agriculture and Markets Law § 370 [imposing criminal liability on an owner of a dangerous animal who fails to exercise due care in protecting the public from such animal]).[4]

---

[4] This Court has also expressly acknowledged, albeit in dictum, that statutes may, in certain circumstances, impose criminal liability based on ordinary negligence (*see People v Haney*, 30 NY2d 328, 334 n 7 [1972] ["(c)riminal liability for death caused by ordinary negligence is sometimes imposed by statute" and "most of these statutes are confined to deaths arising out of automobile accidents"]).  Moreover, other states have likewise recognized that ordinary negligence can supply the mental state necessary for criminal liability (*see e.g. Hoover v State*, 958 A2d 816, 821 [Del 2008] [noting that "(s)everal state courts have recognized the power of a legislature to define a crime based upon ordinary negligence" (internal quotation marks omitted)]; *State v Hazelwood*, 946 P2d 875, 879 [Alaska 1997] ["(I)t is firmly established in our jurisprudence that a mental state of simple or ordinary negligence can support a criminal conviction"]).

We disagree with defendants' suggestion that the Supreme Court's decision in *Elonis* somehow requires reconsideration of our prior caselaw. *Elonis* involved a federal statute that was silent as to any mens rea (*see* 575 US at 732-737, citing 18 USC § 875 [c] [sending threatening communications]). That silence led the Court to apply the well-settled rule of statutory construction that "mere omission from a criminal enactment of any mention of criminal intent should not be read as dispensing with it" (*id.* at 734 [internal quotation marks omitted]). The Court declined, as a matter of statutory interpretation, to have liability under the statute at issue turn on whether a "reasonable person" would regard the communication as a threat (*Elonis*, 575 US at 738 [internal quotation marks omitted]). But in doing so, the Court did not hold that an ordinary negligence mens rea may never be used as a basis for criminal liability (*see id.* at 741; *see also United States v Wilson*, 880 F3d 80, 86 [3d Cir 2018] [rejecting an "attempt to extend *Elonis*'s reasoning to" another statute], *cert denied* 138 S Ct 2586 [2018]; *United States v Kirsch*, 903 F3d 213, 232 [2d Cir 2018], *cert denied* 139 S Ct 1272 [2019]). There is no need for us to infer a negligence standard—or indeed supply any standard—in this case. Unlike the statute in *Elonis*, the Right of Way Law explicitly provides the applicable mens rea—ordinary negligence.

We therefore reject defendants' argument that the Right of Way Law imposes criminal liability based on a mens rea that is insufficient as a matter of law to support criminal liability.

Nor is the mens rea standard void for vagueness. Our well-established test for determining if "a law possesses the certainty and definiteness mandated by due process is whether the language of the statute would indicate to reasonable persons the nature of the

conduct it proscribes" (*People v Hardy*, 4 NY2d 500, 505 [1979]).  Failure to exercise due care is, of course, firmly established as the standard of ordinary negligence (*see United States v Neustadt*, 366 US 696, 706 [1961] ["the duty to use due care" is "the traditional and commonly understood legal definition of the tort of negligen(ce)" (internal quotation marks omitted)]; *Saarinen v Kerr*, 84 NY2d 494, 501 [1994] ["a lack of 'due care under the circumstances'" is "the showing typically associated with ordinary negligence"]).  As this Court noted in *People v Grogan* (260 NY 138 [1932]):

> "The path has been pretty well cut out and emblazoned along which a [person] must proceed to avoid the charge of negligence.  A statute, therefore, which made 'negligent' driving of an automobile, causing injury or danger to another, a 'misdemeanor,' would, we may assume, be constitutional. But a statute falling short of this definiteness would cross the line as we have tried to draw it, and place the offense among those vague attempts to set up crimes which have resulted in unconstitutional legislation" (*id.* at 146-147).

The path here being clearly marked, defendants' vagueness challenge fails.

### B.

Defendants' preemption arguments must be examined in the context of our well-established rules regarding constitutional and statutory "home rule" provisions.  "Although a local government is constitutionally empowered to enact local laws relating to the welfare of its citizens through its police power, it is prohibited from exercising that power through the adoption of local laws that are inconsistent with the New York State Constitution or any general law of the state" (*People v Diack*, 24 NY3d 674, 678-679 [2015], citing NY Const, art IX, § 2 [c]; Municipal Home Rule Law § 10 [1] [i], [ii] [a] [12]).  Accordingly, although broad, the law-making power conferred upon local governments is limited by the

"preemption doctrine" (*Albany Area Bldrs. Assn. v Town of Guilderland*, 74 NY2d 372, 377 [1989]). Conflict preemption prohibits a local government from adopting a law that is "inconsistent with" state law (*New York State Club Assn. v City of New York*, 69 NY2d 211, [1987]). Field preemption prohibits a local government from legislating in a field or area of the law where the "[l]egislature has assumed full regulatory responsibility" (*DJL Rest. Corp. v City of New York*, 96 NY2d 91, 95 [2001]).

Defendants do not challenge the general authority of the City to enact local traffic laws or to make the violation of those laws a crime.[5] Rather, defendants maintain that the City was prohibited by certain provisions in the Penal Law and the Vehicle and Traffic Law from enacting a law that imposes criminal liability based on a mens rea not specifically enumerated in article 15 of the Penal Law. We conclude that the Right of Way Law does not run afoul of the preemption doctrine.

1.

With respect to the Penal Law, defendants argue that various provisions of article 15, which define four culpable mental states, demonstrate an intent by the legislature to occupy the field of culpable mental states acceptable as a basis for criminal liability. Because the Right of Way Law imposes criminal liability based on a mens rea not listed in article 15—ordinary negligence—defendants maintain that the statute conflicts with the

---

[5] We agree with our concurring colleague that this issue was not raised in this case and that the arguments discussed in the concurrence have not been made by the parties (*see* concurring op. at 1-2, 7; *see generally Lewis v Klein*, 45 NY2d 930, 932 [1978] ["In disposing of this appeal the court passes on no issues not raised in the briefs presented to it and is concerned exclusively with the issues raised"]).

Penal Law and encroaches on an area of law where the legislature has assumed full responsibility.  We disagree.

Article 15 of the Penal Law lists and defines four "culpable mental states"— "intentionally," "knowingly," "recklessly," and "criminal negligence" (Penal Law §§ 15.00 [6], 15.05).  However, strict liability is also contemplated by article 15: "[t]he minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which [such person] is physically capable of performing," and, "[i]f such conduct is all that is required for commission of a particular offense, . . . such offense is one of 'strict liability'" (Penal Law § 15.10).

Based on these provisions, defendants assert that the Penal Law's list of culpable mental states is exhaustive, and any offense defined within or outside the Penal Law, unless it is one of strict liability, must incorporate one of the four culpable mental states.  Assuming, for the sake of argument, that article 15 can be interpreted as limiting the culpable mental states that may be used to impose criminal liability, that purported constraint would apply to only crimes defined within the Penal Law itself.

The provisions of the Penal Law "govern the construction of and punishment for any offense defined outside" of the Penal Law, "[u]nless otherwise expressly provided, or unless the context otherwise requires" (Penal Law § 5.05 [2]).  The two key provisions at issue, Penal Law § 15.00 (Culpability; definitions of terms) and § 15.05 (Culpability; definitions of culpable mental states), expressly provide otherwise by making clear that they are "applicable to this chapter" only.  Further contradicting defendants' interpretation

of article 15 is the legislature's own use of an ordinary negligence mens rea for offenses defined outside the Penal Law. For example, as discussed, Vehicle and Traffic Law §1146 and Agriculture and Markets Law § 370—which were enacted after the relevant provisions in article 15 of the Penal Law—both employ an ordinary negligence standard for imposing criminal liability. Clearly, in defining these offenses, the legislature did not feel itself limited to the culpable mental states enumerated in the Penal Law. Accordingly, the legislature has neither expressly nor by implication articulated its intent to occupy this field (*see Jancyn Mfg. Corp. v County of Suffolk*, 71 NY2d 91, 98 [1987] ["No preemptive intent is evident from either the (l)egislature's declaration of State policy in (the at-issue statute) or the statutory scheme which has been enacted"]).

Nor does Penal Law § 15.15 —which governs "construction of statutes with respect to culpable mental states"—in any way prohibit what would otherwise be permitted. Indeed, contrary to defendants' argument, Penal Law § 15.15 (2) neither evinces the legislature's intent to occupy the field nor demonstrates that the list of mental states set forth in Penal Law article 15 was meant to be exclusive. As defendants correctly point out, Penal Law 15.15 (2) applies to offenses "defined both in and outside the Penal Law." However, that provision does not mandate that the list of culpable mental states designated in article 15 is an exhaustive one that applies to offenses defined outside the Penal Law; rather, it merely sets forth a well-settled rule of statutory construction that reflects the Penal Law's general approach to strict liability offenses: unless the legislature has clearly indicated its intent to make a statutory offense one of strict liability, a court should read a culpable mental state into a statute that is *silent* on mens rea (*see* William C. Donnino,

Practice Commentary, McKinney's Cons Laws of NY, Penal Law 15.00 [explaining that the rule codified in Penal Law § 15.15 (2) was enacted because the Penal Law "does not favor" strict liability offenses]; *see generally Elonis*, 575 US at 734-736).[6]  The Right of Way Law is not silent on mens rea; instead, it specifies a mens rea of ordinary negligence. The rule of construction contained in Penal Law § 15.15 (2), governing statutes that omit any mens rea, cannot be used to override that designation, and, therefore, there is no conflict with the local law.

Contrary to defendants' claim, the Right of Way Law is not preempted, either on a field or conflict basis, by the Penal Law.

2.

Defendants assert that the legislature intended for the Vehicle and Traffic Law to occupy the field of motor vehicle regulation, and that the Right of Way Law conflicts with the state law by punishing more harshly the same conduct as Vehicle and Traffic Law § 1146.  Again, we disagree.

The provisions of the Vehicle and Traffic Law are intended to be "uniform throughout this State" (Vehicle and Traffic Law § 1600; *see also id.* § 1604).  And no local

---

[6] The provision reads, in relevant part, as follows:
> "Although no culpable mental state is expressly designated in a statute defining an offense, a culpable mental state may nevertheless be required for the commission of such offense, or with respect to some or all of the material elements thereof, if the proscribed conduct necessarily involves such culpable mental state. A statute defining a crime, unless clearly indicating a legislative intent to impose strict liability, should be construed as defining a crime of mental culpability" (Penal Law § 15.15 [2]).

government or municipality may "enact or enforce any local law, ordinance, order, rule or regulation in conflict with the provisions" of the Vehicle and Traffic Law unless "expressly authorized" to do so (Vehicle and Traffic Law § 1600).  However, the Vehicle and Traffic Law also authorizes New York City to pass laws relating to, among other things, "traffic on or pedestrian use of any highway," including "[r]ight of way of vehicles and pedestrians" (Vehicle and Traffic Law § 1642 [a] [10]).  The Right of Way Law falls within this delegation of authority, defeating defendants' field preemption claim.

Defendants' conflict preemption claim fares no better.  As we made clear in rejecting a preemption challenge to a City ordinance making it a misdemeanor to possess an imitation pistol, "[t]he mere fact that a local law may deal with some of the same matters touched upon by State law does not render the local law invalid" (*People v Judiz*, 38 NY2d 529, 531-532 [1976] [internal quotation marks omitted]).  For a local law to be invalid pursuant to the conflict preemption doctrine, the State must specifically permit the conduct the local law prohibits or provide "some other indication that deviation from state law is prohibited" (*Garcia v New York City Dept. of Health & Mental Hygiene*, 31 NY3d 601, 617-618 [2018] [internal quotation marks omitted]).  Such is not the case here.  As discussed, the Right of Way Law imposes liability on a driver who causes physical injury to a pedestrian or bicyclist while failing to exercise due care (*see* Administrative Code of City of NY § 19-190 [a]-[c]).  The state law does not permit this conduct, nor is there any indication that the City is somehow constrained in prohibiting it (*see* Vehicle and Traffic Law § 1146 [b] [1]).

In any event, even accepting defendants' description of the purported "conflict"—that the Right of Way Law punishes more harshly the same conduct as Vehicle and Traffic Law § 1146—defendants' preemption argument fails. Indeed, although the Right of Way Law creates a misdemeanor offense for a first-time offender (*see* Administrative Code of City of NY § 19-190 [b]), whereas Vehicle and Traffic Law § 1146 creates only a traffic infraction for such an offender (*see* Vehicle and Traffic Law § 1146 [b] [1], [c] [1]), we have held that a local law's imposition of a stricter penalty than a state law does not amount to a conflict for preemption purposes (*see Zakrzewska v New School*, 14 NY3d 469, 480 [2010] ["A local law may, however, provide a greater penalty than state law"]; *see e.g. People v Lewis*, 295 NY 42, 50-51 [1945] [Administrative Code of the City of New York provision imposing "heavier penalties" than equivalent state law is not a difference "of such a character as to render one inconsistent with the other"]). In sum, the Right of Way Law does not conflict with § 1146.

* * *

The City, acting pursuant to a delegation of police power by the State, enacted the Right of Way Law to address "the epidemic of traffic fatalities and injuries on [its] streets" (City of New York, *Vision Zero Action Plan*, 3 [2014], available at https://perma.cc/VW4Z-WGJ2 [last accessed Sept. 19, 2021]). We hold that the law is a valid exercise of that delegated power (*see Judiz,* 38 NY2d at 531-532).

Defendants' remaining contentions are unpreserved.

Accordingly, in each case, the order of the Appellate Term should be affirmed.

WILSON, J. (concurring):

I join the majority's decision in full. As the majority notes, Mr. Torres and Mr. Lewis "do not challenge the general authority of the City to enact local traffic laws or to make the violation of those laws a crime" (majority op at 8). I write separately because the basis for the City's authority to criminalize traffic infractions is unclear: New York's

Vehicle and Traffic Law may bar cities from attaching criminal sanctions to certain traffic violations.

As an initial observation, although I agree that criminal liability could rest on an ordinary negligence standard instead of one of the traditional types of *mens rea*, such statutes are exceedingly rare. Further, if New York City intended to impose criminal liability by use of a civil negligence standard, it has not done so in a straightforward way, but instead has articulated a lack of negligence as an exception to liability. The unusualness of the City's action does not render it unauthorized, but it might inform the way in which the relevant State laws should be interpreted.

Two provisions in the state's Vehicle and Traffic Law suggest limits to cities' regulation of traffic through criminal sanctions. Neither appellant raised those provisions as a ground for reversal. First, Vehicle and Traffic Law § 155 defines the term "traffic infraction" as a violation of most provisions of the Vehicle and Traffic Law "or of any law, ordinance, order, rule or regulation regulating traffic" that is "not declared by this chapter or other law of this state to be a misdemeanor or a felony." Section 155 further states that "[a] traffic infraction is not a crime and the punishment imposed therefor shall not be deemed for any purpose a penal or criminal punishment and shall not affect or impair the credibility as a witness or otherwise of any person convicted thereof." Vehicle and Traffic Law § 1800 echoes Section 155: "[i]t is a traffic infraction for any person to violate any of the provisions of this chapter or of any local law, ordinance, order, rule or regulation adopted pursuant to this chapter, unless such violation is by this chapter or

other law of this state declared to be a misdemeanor or a felony" (Vehicle and Traffic Law § 1800 [a]). A plain reading of Vehicle and Traffic Law §§ 155 and 1800 suggests that unless the State has determined that a particular violation is a misdemeanor or felony, no "local law, ordinance, order, rule or regulation" can transform it into one – it must be classified as a "traffic infraction." Thus, Vehicle and Traffic Law §§ 155 and 1800 may preempt cities from making traffic violations a crime.

Under that reading, the Vehicle and Traffic Law would prohibit New York City from criminalizing the conduct set out in Administrative Code § 19-190, known as the Right of Way Law. Section 19-190 makes it a misdemeanor for a driver to strike and physically injure a pedestrian or bicyclist who has the right of way unless the driver exercised due care (Administrative Code § 19-190 [a], [b], [c]). The law of New York state, however, does not make that conduct a misdemeanor or a felony. Indeed, Vehicle and Traffic Law § 1146 makes a similar, though not identical, violation a "traffic infraction," which under Vehicle and Traffic Law § 155 is not a crime (Vehicle and Traffic Law § 1146 [a], [b], [c]; Vehicle and Traffic Law § 155).

The legislative history suggests that a concern about over-criminalizing traffic violations motivated the Legislature to adopt the provisions in Vehicle and Traffic Law §§ 155 and 1800. The relevant provisions were adopted in 1934. Assembly Member James R. Robinson, who introduced the provisions, described the "principal object" of his bill as "the removal of criminal stigma which now attaches to all minor traffic violations" by "set[ting] up a new offense known as 'traffic infraction'[ ]" to avoid

making individuals who violate traffic regulations guilty of misdemeanors (Letter from

James R. Robinson, Assembly Member, to Charles Poletti, Counsel to Governor Herbert

H. Lehman, May 7, 1934, Bill Jacket, L 1934, ch 485 at 21). Assembly Member

Robinson introduced the bill at the request of the New York State Magistrates

Association and requested Judge Francis Bergan, a member of that association,[1] to submit

a memorandum in support of the bill to the Governor (*id.*). In his memorandum, Judge

Bergan explained that he and many other judges who oversaw traffic violations felt "that

a large portion of such violations are not criminal in nature, and that no stigma of crime

should be attached to the violation[s] beyond the actual punishment or penalty imposed

by the Court" (Letter and Memorandum from Justice Francis Bergan, Justice, Police

Court, City of Albany, to Governor Herbert H. Lehman, April 25, 1934, at 1, Bill Jacket,

L 1934, ch 485 at 8). The bill's purpose, according to Judge Bergan, was to create "a new

offense known as 'traffic infraction,' which is specifically non-criminal" in order to

"prevent [ ] criminal stigma from attaching to persons" convicted of minor traffic

violations (*id.* at 2). Judge Bergan listed an array of statistics illustrating the problem the

legislation sought to address. In the three prior years alone, there were 1.3 million

charges of traffic violations, each a misdemeanor, making "it [ ] apparent that almost

---

[1] Judge Bergan remains one of the most respected jurists in New York's history: a Justice of the Appellate Division, Third Department, then simultaneously a Justice of both the Third and First Departments, and later Presiding Justice of the Third Department; a Judge of this Court; a delegate to the 1938 constitutional convention, at which he drafted the county home rule provision; and a delegate to the 1965 constitutional convention, at which he served as the chair of the Committee on Education. He also authored The History of the New York Court of Appeals, 1847-1932.

everyone who drives a car has had, or will soon have, a misdemeanor conviction" (*id.* at

2-3). An "overwhelmingly large percentage" of these cases were for "petit and minor

infractions" (*id.*). Indeed, Judge Bergan wrote, the Department of Corrections estimated

that 75 percent of all misdemeanor cases were traffic cases (*id.* at 3). The absence of a

noncriminal offense for traffic violations thus resulted in "huge accumulations of the

names of persons who are not criminals in any sense" in the state's criminal records (*id.*).

Those records were "cumbersome to the State," as well as "a source of continued

embarrassment to the persons convicted," who would have to disclose their convictions

for their traffic violations in a variety of contexts (*id.*). Judge Bergan mused that "[t]he

man who parks too far from the curb or commits a similar traffic violation finds himself

in the same criminal category as one who commits petit larceny, unlawful entry, assault

in the third degree, is a common gambler or operates a house of ill fame" (*id.*). Many

individuals in their official capacity echoed these sentiments and urged passage of the

bill.[2]

---

[2] *See* Letter from Mark Graves, Commissioner of Taxation and Finance, to Governor
Herbert H. Lehman, April 26, 1934, Bill Jacket, L 1934, ch 485 at 12; Letter from George
W. Woltz, Chief Judge, City Court of Buffalo, to Governor Herbert H. Lehman, April 26,
1934, Bill Jacket, L 1934, ch 485 at 13; Letter from Arthur L. Wilder, City Judge,
Rochester, President, New York State Association of Magistrates, to Governor Herbert H.
Lehman, April 27, 1934, Bill Jacket, L 1934, ch 485 at 14; Letter from Walter N. Thayer,
Jr., Commissioner, New York Department of Correction, to Charles Poletti, Counsel to
Governor Herbert H. Lehman, May 5, 1934, Bill Jacket, L 1934, ch 485 at 20;
Memorandum from Timothy F. Cohan, Assistant Attorney General, on behalf of John J.
Bennett, Jr., Attorney-General, to Governor Herbert H. Lehman, May 8, 1934, at 3, Bill
Jacket, L 1934, ch 485 at 24.

In passing the provisions now in Vehicle and Traffic Law §§ 155 and 1800, the Legislature appears to have reserved to itself the ability to make traffic violations criminal. Before Assembly Member Robinson's bill passed in 1934, the definition of "crime" in the state's Penal Law included any act or omission prohibited by law that could be punished by a fine alone (Bender's Penal Law and the Code of Criminal Procedure of NY 1933, Art. 1 § 2). In his memorandum to the Governor, Judge Bergan pointed out that in a separate section of the Vehicle and Traffic Law at the time, the Legislature appeared to intend that only third or subsequent offenses of a particular kind within a year should be criminalized as a misdemeanor (Letter and Memorandum from Justice Francis Bergan at 4). Due to the Penal Law's definition of crime, however, "even the violation of local ordinances adopted in pursuance to the Vehicle and Traffic Law [were] crimes" (*id.*). In other words, to meet the Legislature's apparent intent, the bill needed to amend the Penal Law to account for "traffic infraction" as a non-criminal offense, which it did. Thus, the definition of violations of "any local law, ordinance, order, rule or regulation" as traffic infractions in Vehicle and Traffic Law § 1800 suggests that the Legislature intended to bar all political subdivisions of the State from criminalizing traffic infractions unless the Legislature itself had designated them as misdemeanors or felonies (Vehicle and Traffic Law § 1800 [a]).

In addition to the statutory language and legislative history, one other set of facts gives me pause. New York City appears to have had some doubt as to its own authority to criminalize the conduct at issue here. Before passing Administrative Code § 19-190, the

City actively lobbied the Legislature to amend the Vehicle and Traffic Law to make it a misdemeanor for a driver to fail to exercise due care and cause physical injury to a pedestrian or a bicyclist (*see* City of New York, *Vision Zero Action Plan*, 22 [2014]). The City failed to convince the Legislature to do so, after which the City adopted Administrative Code 19-190, the ordinance under which Mr. Torres and Mr. Lewis were convicted.

Thus, there remains an open question, unresolved by this case, as to whether cities or other political subdivisions of the State can criminalize violations that the State has designated as traffic infractions. Our affirmance of the convictions here should not be understood to have resolved that question, which I also do not see raised or resolved in any of our prior decisions.

For No. 52: Order affirmed. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Rivera, Fahey, Wilson, Singas and Cannataro concur, Judge Wilson in a concurring opinion.

For No. 53: Order affirmed. Opinion by Judge Garcia. Chief Judge DiFiore and Judges Rivera, Fahey, Wilson, Singas and Cannataro concur, Judge Wilson in a concurring opinion.